# ROBERT WILSON *v*. CROSS & CO.

NEW TRIAL WHEN EVIDENCE CONSISTS OF DEPOSITIONS. — When the testimony below consists entirely of depositions, which depositions are contained in the record on appeal, the appellate Court will examine the evidence to determine

whether the Court below deduced the right conclusions of facts therefrom, and if it is of opinion it did not, will grant a new trial.

IDEM.—The rule that a new trial will not be granted by the appellate Court when there is a conflict in the evidence, does not retain its full force when the testimony consists entirely of depositions, and the Court below had no opportunity to judge of the manner and bearing of witnesses.

GENERAL AVERAGE IN MARITIME LAW.—General average in maritime law is a contribution made by the owners of a vessel and cargo, and all concerned in the success of her voyage, towards a loss sustained by some of the parties interested, for the benefit of all.

ACTION FOR GENERAL AVERAGE. — The owner of a vessel cannot maintain an action for contribution in general average for damage sustained and expense incurred by reason of the peril of the seas, unless the vessel was seaworthy when she left port.

IDEM.—If the defect in the vessel when she left port was unknown to the owner, and undiscoverable upon examination, he cannot maintain an action for general average.

PROTEST AS EVIDENCE.—If a protest of the officers of a vessel is received in evidence, without objection, on behalf of the owner or master, in an action for contribution in general average, it is not conclusive on his behalf of the facts therein recited.

APPEAL from the District Court, Fourth Judicial District, City and County of San Francisco.

The protest of the officers of the vessel was received in evidence in the Court below, on behalf of the master, without objection.

The other facts are stated in the opinion of the Court.

*Sharpstein & Hastings,* for Appellants.

The Court in this case is not controlled by the rule that no reversal of a judgment will be granted on account of insufficiency of the evidence where there is any conflict of testimony. The reason of that rule is well known; it is that the appellate Court does not have before it the witnesses; cannot see how they give their testimony; cannot observe their behavior. It is because " the appellate Court cannot satisfy itself in a decision upon such matters, so much depends upon the manner, bearing, and character of witnesses, the peculiar circumstances of which the transcript fails to preserve." (*Kimball* v. *Gearhart,* 12 Cal. 48 ; Starkie on Evidence, 727–9, Sharswood's ed.; 3 Blackstone's Com. 373.) But

where the evidence is *documentary*, or taken by depositions, this rule does not obtain, the *reason* of the rule being entirely wanting.

In order that the master may successfully assert a claim for average against the consignees of the cargo, it must, first of all, appear that the vessel at the time of entering upon her voyage, and during its continuance, was *seaworthy*. For, if expense in repair of the ship is incurred, or if portions of her cargo be jettisoned on account of the unseaworthiness of the vessel, and compensation be demanded therefor, however necessary such repairs or jettison might at the moment of time have been, it would be a necessity occasioned by the negligence, fault, or wrong of the owners of the ship. They cannot take advantage of their own negligence, fault, or wrong. If they cannot, neither can the master who represents them. (Abbott on Shipping, Part IV, Chap. V, 340–8, margin; 1 Parsons on Maritime Law, 122–239, note 3; *Lawrence v. Minturn*, 17 How. U. S. 111; *Gen. Mutual Insurance Co. v. Sherwood*, 14 Ib. 365; *The Bark Gentleman*, Olcott's Ad. R. 115; *Putnam v. Wood*, 3 Mass. 481.) So, also, if it became necessary for the bark Harwood to deviate from her voyage from Glasgow to San Francisco, and enter the port of Rio Janeiro for repair of the leak, if the necessity for such repair grew out of the unseaworthiness of the ship, the expense incurred in entering and leaving Rio cannot be recovered in this action, but must rest upon the vessel.

It does not matter whether the unseaworthiness is known or unknown to the ship owners; whether the defect is latent or patent. The principle is, " the ship owner contracts that the vessel is fit for the intended voyage, and for the use for which she is employed." (Abbott on Shipping, 341–4, margin; *Putnam v. Wood*, 3 Mass. 481; *Christie v. Trott*, 25 Eng. L. & E. 262; *Whitehall v. Brig William Henry*, 4 La. 223; 1 Parsons on Maritime Law, 239, note 3.)

The bark Harwood, from the time of her sailing from Glasgow, on December 26th, 1864, until the cargo was broken out at sea and the leak stopped by the carpenter, on the 28th day of January, 1865, was unseaworthy. (*Talcott v. Commer-*

*cial Ins. Co.* 2 Johns. 123–9 ; *Putnam* v. *Wood,* 3 Mass. 481 ;
*Backhouse* v. *Sneed,* 1 Murphy, N. C. R. 173 ; *Christie* v. *Trott,*
25 Eng. L. & E. 262 ; *Lengsfield* v. *Jones,* 11 La. 624 ; *Dupont
de Nemours & Co.* v. *Vance et al.,* 19 How. U. S. 167 ; Mar-
shall on Insurance, 363–9.)   The question of seaworthiness
is, of course, one of fact ; but the authorities cited under this
point may serve to throw some light upon it.   Certain it is
that a ship is unseaworthy which is incompetent to withstand
the ordinary action of wind and waves.   An examination of
the evidence will show that the bark Harwood was thus
incompetent.   The right of a master to deviate from his
course and enter a port for relief, and then claim a contribu-
tion in average from the consignees of the cargo for the
expense incurred and the damage resulting therefrom, is
identical with his right to make a jettison of the cargo ; to
hypothecate the cargo ; to strand the ship.   They are flowers
which grow out of the same stem.   No such right ever arises
to the master unless from " extreme necessity," from " immi-
nent danger," from " a danger imminent and apparently
irresistible," from " that necessity which knows no law, and
sweeps all ordinary rules before it."   (3 Kent's Com. 232–7,
margin ; Abbott on Shipping, 475–7, margin ; 1 Parsons on
Maritime Law, 293 ; *The Gratitudine,* 3 Robinson's Ad. R.
196, 209–11 ; *Dupont de Nemours* v. *Vance et al.,* 19 How.
U. S. 169–70 ; *Barnard et al.* v. *Adams et al.,* 10 How. U. S.
283, 303–4 ; *Myers* v. *Barmore,* 10 Pa. 118.)

*B. S. Brooks,* for Respondent.

Preliminary to the argument of the errors assigned, appel-
lant's counsel takes the ground that, because a greater part
of the evidence was taken by depositions which are before
the Court *in hæc verba,* therefore this Court is not controlled
by the rule " that no reversal of judgment will be granted on
account of insufficiency of the evidence, where there is any
conflict of testimony ;" and the reason which he assigns is,
that the reason of the rule failing, the rule fails ; and that the

reason of the rule is, that the appellate Court does not see the witnesses.

I apprehend. that the counsel mistakes the reason of the rule. The true reason of the rule is one of *jurisdiction.* The Court responds to questions of law—the jury to questions of fact. The Court has no more jurisdiction to try a question of fact than the jury has to try a question of law. Where there is *no conflict* of testimony, or no testimony to prove some necessary fact, there is no question of fact; it then becomes a question of law, and the appellate Court passes upon it. If there is a conflict of testimony, the Court has no jurisdiction to pass upon it.

The first point is : " that a vessel cannot recover for general averge, unless she was seaworthy when she left port." I am not willing to concede its correctness. None of the cases cited by the appellant's counsel sustain his position ; nor do they decide the point one way or the other. The chapter cited from Abbott (Part IV, Chap. V, pp. 340–8) is devoted to the general duties of masters and owners, and contains not one word relative to general average. Chapter X, of the same Part, (pp. 473–511,) covering thirty-eight pages of that work, with copious notes and references, is devoted to the subject of general average, stating minutely everything that will defeat the claim ; but he nowhere states that the unseaworthiness of the ship constitutes a defence ; nor does any author that I have consulted ; and it is somewhat remarkable, if such is the principle, that no case can be found that so decides, and no author can be cited who lays down such a proposition. The case of *Lawrence* v. *Minturn,* 17 How. 111, was a case of jettison, and decided in favor of the ship. The case of *The General Mutual Insuranee Co.* v. *Sherwood,* 14 How. 365, was a case of insurance, where undoubtedly unseaworthiness is a defence, as seaworthiness is part of the contract. *The Bark Gentleman,* Olcott, 115, was a libel against a vessel for damage to cargo. The case of *Putnam* v. *Wood,* 3 Mass. 481, was an action against the owner of the ship for damage to cargo.

It will be seen that none of these cases touch the point at

all; for in all these cases there is no question that the ship is liable and the insurers are not, if the loss happens from any unseaworthiness of the vessel; and the reason is, that the action is upon the contract, and by the express terms of the contract the owner warrants the ship seaworthy, and he is therefore liable for any defect, whether he knows it or not. In such case, there is no question of *negligence*, it is simply a question of contract.

The counsel's second position is, that " the bark Harwood, *from* the time of her sailing from Glasgow, on December 26th, 1864, until the cargo was broken out at sea, and the leak stopped by the carpenter, on the 28th day of January, 1865, was unseaworthy."

This would be no defence, even if it were true, and the action was by the ship herself. The authorities cited by him, under this point, do not appear to have much bearing upon the case. In *Talcott* v. *The Commercial Insurance Co.*, 2 Johns. 125, it was held that " where a vessel sailed, with a fair wind and moderate weather, and in the evening of the same day suddenly sprung a leak, in consequence of which she foundered, without any apparent cause or extraordinary accident to which the leak could be ascribed, in an action on a policy of insurance, the loss was to be presumed to have arisen from her not being seaworthy at the time she sailed." In *Putnam* v. *Wood*, 3 Mass. 481, the vessel, without any manner of accident, but lying in the harbor, sprung a leak. *Backhouse* v. *Snead*, 1 Murph. 173, merely decides that the owner is responsible for secret defects. In *Christie* v. *Trott*, 25 Eng. L. and E. 262, the vessel sprung a leak while at the wharf. In *Dupont de Nemours & Co.* v. *Vance et al.*, 19 How. U. S. 167, the vessel was held to be seaworthy, though she had two worm holes, which were in the plank when it was put on. There is nothing in these cases that throws any light upon the case.

I most decidedly dissent from the position " that the right of the master to deviate from the voyage for the repair of his ship, is identical with his right to jettison his cargo;" and

9

from the position that " either right is to be exercised solely when the danger is imminent and apparently irresistible." The true rule is laid down in regard to jettison by the Supreme Court of the United States, in *Lawrence* v. *Minturn,* 17 Howard, 109. In that case, after the storm was over and in calm weather, the master threw overboard a steam boiler, pipes, etc., and the Court say :

" Upon these facts we have come to the conclusion that the jettison was necessary for the common safety. The nature of the case imposes on the master the duty and clothes him with the power to judge and determine, upon the facts before him, whether a jettison be necessary. He derives this authority from the implied consent of all concerned in the common adventure. The obligation of the owners is to appoint a competent master, having reasonable skill and judgment and courage ; and they are liable if, through his failure to possess or exert these qualities in any emergency, the interest of the shippers is prejudiced. But they do not contract for his infallibility, nor that he shall do. in an emergency precisely what, after the event, others may think would have been best. If he was a competent master ; if an emergency actually existed calling for a decision whether to make a jettison of a part of the cargo ; if he appears to have arrived at his decision with due deliberation, by a fair exercise of his skill and discretion, with no unreasonable timidity, and with an honest intent to do his duty—the jettison is lawful. It will be deemed to have been necessary for the common safety, because the person to whom the law has intrusted authority to decide upon and make it, has duly exercised that authority."

By the Court, CURREY, C. J. :

This action was brought by the plaintiff, master of the British bark Harwood, against the defendants, owners and consignees of a portion of the cargo of the bark, for contribution in general average. The complaint alleges the proper facts constituting a cause of action, setting forth that the

vessel was seaworthy when she left the port of Glasgow, Scotland, for the port of San Francisco, and that her deviation from her proper course and entering the port of Rio de Janeiro was necessary for her safety and the safety of her cargo ; and that the damages sustained by the vessel and cargo, and the repairs made and the materials furnished in and about the making of such repairs, were necessary and proper items of average. The material allegations of the complaint were controverted by the answer.

The cause was tried by the Court without a jury, and a finding and judgment rendered for plaintiff against Cross & Co. for three hundred and thirteen dollars, besides costs. They applied for a new trial, which was denied, and then appealed.

The only point presented on the motion for a new trial, which we are called upon to review, may be stated to be that the evidence was insufficient to justify the findings and decision of the Court, and therefore the judgment is against law.

At the very threshold of this question the objection is made that this Court cannot reverse a judgment on account of the insufficiency of the evidence to support it, if there is any conflict in the testimony material to the issue, for the reason that we 'have no jurisdiction in such case to pass upon the facts in issue.   On the other hand, it is maintained that, as the testimony produced to make out the plaintiff's case consisted of depositions, the Court which rendered the decision and judgment had no better opportunity to determine from the manner, bearing, conduct and character of the witnesses, the credit and weight to be given to their testimony, than this Court has, and that therefore the reason of the rule which ordinarily governs the subject cannot be applied in this case. Where there is a conflict of evidence upon a material fact in issue, Courts of appeal are not in the habit of reversing judgments depending upon the finding of the issue either the one way or the other.   Where the testimony of the witnesses is conflicting, the result depends mainly upon the degree of credibility to which they may respectively be entitled, and of that the jury and the Court before which such witnesses

appear have an opportunity to judge, while this Court has not, in so far as it may depend upon the conduct and bearing and upon the character of the witnesses for intelligence and integrity exhibited on the witness stand. In *Kimball* v. *Gearheart*, 12 Cal. 48, the Court held in substance that it would not reverse a judgment because the verdict was against the weight of evidence except in extraordinary cases, and the reason assigned was because so much depends upon the manner, bearing and character of the witnesses, and the peculiar circumstances which the record fails to preserve, which give value and weight to the testimony; and in *Ritter* v. *Stock*, 12 Cal. 402, upon this subject the Court said : " The jury having heard the testimony and observed the manner of the various witnesses produced before them, had better opportunities of forming a correct judgment than the appellate Court from merely reading the statement of the evidence," and therefore refused to interfere with the verdict. In *Rice* v. *Cunningham*, 29 Cal. 494, one of the grounds on which the appellant asked that the judgment might be reversed and a new trial granted, was because the verdict was contrary to the evidence. In respect to the question, the Court, by SANDERSON, Chief Justice, said: " It is proper to remark that the expression, which has become very common, that this Court will not look into the evidence, if it is conflicting, for the purpose of determining whether the verdict ought to stand, is not very exact. On the contrary, we always look into the evidence whenever the point is made; but if, upon careful examination, it appears that there is a substantial conflict, in view of which, as presented to us, the jury might find either way without becoming obnoxious to the charge of passion, prejudice, misconception or caprice, we do not disturb the verdict, although we might, if sitting as a jury, find a different verdict; and we do this because we are cut off from those important aids to the attainment of a correct conclusion which the jury and the Court below find in the appearance and general bearing of the witnesses. The rule in question is applied only when there is a real and substantial conflict upon material points, and has no applica-

tion when the conflict is more apparent than real, or does not relate to controlling issues."

These authorities show very clearly the ground on which this Court has placed its refusal to disturb verdicts and judgments in cases where the testimony in support of the respective sides of the issue joined is in conflict, and at the same time inculcate it as the right and duty of the Court to do so when there is a substantial conflict, and the ends of justice upon the clear weight of the evidence require a judgment and verdict different from that rendered.

In the examination of this case the value and weight of the testimony of the witnesses whose depositions were read in evidence is to be estimated by its worth as it appears upon the face of the depositions, as the circumstances of manner, bearing and conduct of the witnesses in the presence of the officer who heard them testify and observed their deportment were not apparent to the Court that determined the case upon the testimony of such witnesses, except from the face of the depositions themselves; and in respect to what so appears this Court has the same opportunities of judging as had the Court below. Hence, we shall proceed to examine the evidence produced at the trial with the view of determining whether, in our judgment, the Court below deduced therefrom right conclusions of facts or otherwise, in order to further determine whether such conclusions of facts were correct or, as a matter of law, were erroneous.

The doctrine of general average, says Kent, grows out of the incidents of a mercantile voyage, and the duties which it creates apply equally to the owner of the ship and of the cargo. General, gross or extraordinary average means a contribution made by all the parties concerned toward a loss sustained by some of the parties in interest for the benefit of all. (3 Kent, 6th ed., 232.) Whether the master of the bark in this case, the representative of the owner of the vessel, can properly maintain the action for contribution for expenses incurred and damages sustained by reason of the leaking of the vessel, must depend upon the fact whether the alleged cause of peril was because she was not seaworthy when she

left port or was the result of a disaster on the voyage occasioned by the *vis major* or *casus fortuitous*. If such expenses and damage were sustained because the vessel was not in a suitable condition to perform the particular voyage on which she entered, the loss should be borne by her owner, otherwise by all concerned in her success from her port of embarkation to her port of destination. As between the owner of a ship and the freighter, the owner is bound to see that the ship is seaworthy, that is, that she is tight, stanch, strong, well furnished, manned, victualed, and in all respects equipped in the usual manner, for the service in which she is employed. (3 Kent, 205.) If there be a latent defect in the vessel unknown to the owner, and undiscoverable upon examination, the owner must answer for the damage occasioned by the defect. It is an implied warranty in the contract that the ship be sufficient for the voyage, and the owner, like a common carrier, is an insurer against everything but the excepted perils, (3 Kent, 205,) which are the events falling within the meaning of one of the expressions—act of God and public enemies. (3 Kent, 216 ; Abbott on Shipping, 340 ; *Putnam* v. *Wood*, 3 Mass. 481.) The books are full on this point, and it is only necessary to state the doctrine of the law on the subject in general terms, before reviewing the evidence, for the purpose of ascertaining whether the vessel named was seaworthy when she left the port of Glasgow. If she was not, and the causes for which the appellant was called upon by this action to contribute were the consequences of unseaworthiness, then there existed no cause of action against them, and the finding and judgment should have been in their favor.

The evidence upon which the finding and judgment was based consists mostly of depositions and the protest made by the officers of the bark before the British Consul at San Francisco, purporting to narrate the particulars of the voyage, of the storms and bad weather the vessel encountered, and the accidents and disasters which occurred. The testimony of the witnesses who appeared in Court has no reference to the condition of the bark before she arrived at the port of San Francisco. The protest prepared as above

stated, if permitted to be given in evidence for the master or owner of the vessel, is not conclusive in their behalf of the facts as stated therein.    Mr. Abbott, in his work on shipping, (p. 380,) treating of the protest, says: " With whatever formalities drawn up it cannot be received in our Courts as evidence for the master or his owners; but it may be evidence against him and them, and he should take care to supply from the log-book, his own recollection and that of the mate, or trustworthy mariners, true and faithful instructions for its preparation.    Protests are often of great utility in matters connected with the adjustment of losses in marine insurance and the calculation of averages; they are received as evidence in foreign Courts, and with us credit is often given to their contents by merchants and underwriters when free from all circumstances of suspicion."    (2 Par. on Mar. Law, 489.)    This reference to the law respecting protests is made that the actual value of the protest in this case as evidence may be appreciated in the consideration of the testimony of the officers of the vessel.

The plaintiff deposed on his direct examination that the bark left Glasgow, bound for the port of San Francisco, on the 26th of December, 1864, at which time she " was stanch, stiff, tight and strong, well found, manned, rigged and equipped, her hatches sufficiently secured, and she was in every respect seaworthy and fit for the voyage," and that the cargo was well stowed.    He further testified that the voyage was generally rough and tempestuous until the 28th of January, when, owing to the straining of the vessel by previous heavy weather, he found a heavy leak near the water closet pipe.    It was then repaired by the carpenter, after which the vessel leaked less.    On the second of February, upon consultation with the mate and carpenter, it was determined, says the plaintiff, that it would be unsafe for the vessel, cargo and all concerned to proceed around Cape Horn without thoroughly repairing the leak, and thereupon the bark was run into the harbor of Rio de Janeiro, where the expense in part for which this action was brought was incurred; and he stated as a witness that it was his opinion the vessel could

not have proceeded on her voyage around the Horn with safety to herself and cargo without making the repairs which were made at Rio de Janeiro. The testimony of the mate as to the condition of the vessel when she left Glasgow was substantially in corroboration of that of the plaintiff, though his opportunities to the formation of an entirely reliable opinion upon the subject were not so favorable to that end. He joined the vessel on the day next preceding her departure from Glasgow, and consequently did not know or pretend to know whether or not she was seaworthy then, though he says to the best of his knowledge he believes she was so in every respect, and when asked what was the cause of the various injuries which he had mentioned as happening to the vessel during her voyage, he answered, "The perils of the sea." He kept the log-book, and he says the protest is a correct copy of the items of the log-book, and that to the best of his belief the protest is a true statement. The testimony of the mate is less direct and positive than that of the plaintiff.

The deposition of the ship carpenter was also given in evidence. From his superior opportunities of knowledge as to the condition of the vessel when she left Glasgow and subsequently, his testimony is entitled to more weight than that of any other witness and of all the witnesses beside in respect to the matters of which he gave evidence. He testified that he believed the incidents of the voyage set forth in the protest to be true and correct in every respect, and that up to the second of February the vessel did not experience what could be called rough weather. The nature of the weather and the rolling of the sea on the first, second, third, ninth and tenth days of January as described in the protest would undoubtedly seem rough and tempestuous to a landsman, but upon the mind of the witness, who had been a sailor for many years, it produced no such impression, though large quantities of water were shipped, requiring almost constant attention at the pumps. This witness further testified that sometime in January (which, by reference to the protest, is ascertained to have been on the twenty-eighth of that month)

the leak was discovered in the water closet pipe, which he was of opinion was owing to the vessel's "taking ground" while she was being loaded, before the voyage was commenced. A few days after the vessel had commenced her voyage this witness discovered she was leaking, and he expressed it as his opinion, that considering the extent of the leaking and the nature of the weather she had experienced up to that time, she was not seaworthy at the beginning of the voyage. This unseaworthiness was in his estimation owing solely to the leak which he described as in the water closet pipe about two feet below the water line. The opinion and judgment of the carpenter on this point is fortified by a circumstance related by the testimony of one of the sailors which is in our estimation of much force, which is, that some five or six days after leaving port on the 26th of December, all hands, that is the crew, went aft and told the Captain that they did not want to go on with the vessel leaking as badly as she did, and asked him to return to port on that account, to which he answered that "he had ports on the way he would call at if the vessel did not make less water." The testimony of the two witnesses seems to us conclusive as to the condition of the vessel when she entered upon her voyage, and establishes the fact that she was not then seaworthy.

Considerable evidence was produced for the purpose of showing that the deviation of the vessel from her course and her entrance into the port of Rio de Janeiro was not mainly because it was not safe to proceed on the voyage without a more thorough repairing of the vessel than had already been accomplished by the carpenter immediately after the place of the leak had been discovered, but on account of the sickness of plaintiff's wife, who was with him on board the vessel. The evidence on this subject tended strongly to the conclusion that the case of the sick woman was more the cause of the stopping at Rio de Janeiro than was the condition of the vessel, because, before the course of the vessel was changed to enter the port of Rio de Janeiro, the plaintiff consulted the mate on the subject, and the reason given for wishing to

do so was to land his wife; and the mate testified that on the second of February the vessel was hauled up for Rio to land the Captain's wife, and an entry was made in the log-book of that date by the mate to that effect, which he says was correct. But it is not necessary to further notice this feature of the case, as we are of the opinion the vessel was not seaworthy at the time she left the port of Glasgow, and therefore that the recovery had by the plaintiff against the appellants was not justified by the evidence, but was contrary thereto.

Judgment reversed and a new trial ordered.

Mr. Justice SAWYER did not express an opinion.