[L. A. No. 9575. In Bank.—September 26, 1929.]

H. I. TUPMAN et al., Appellants, v. C. F. HABERKERN et al., Respondents.

Anderson & Anderson for Appellants.

F. E. Borton and Borton & Petrini for Respondents.

SHENK, J.—This is an appeal from a judgment in favor of defendants in an action wherein the plaintiffs sought an accounting of profits received by the defendants by virtue of a transaction involving a lease from the United States government of certain oil lands in the "Elk Hills" district in Kern County. The action was brought on the theory that the lease procured at the conclusion of the events hereinafter outlined was the fulfillment of a joint adventure entered into among the plaintiffs, H. I. Tupman, Fred V. Gordon and C. V. Anderson, and two of the defendants, C. F. Haberkern and S. P. Wible. The defendant T. E. Klipstein was joined in the action on the theory that he conspired with the other two defendants to deprive the plaintiffs of their alleged share of profits.

By their amended complaint plaintiffs allege in substance that they and the defendants Haberkern and Wible on April 10, 1910, entered into an agreement whereby they became associated for the purpose of acquiring a five-sevenths interest from one R. J. White, in certain placer mining claims designated as Red Tops Nos. 1, 2, 3 and 4, which embrace all of section 2 in township 31 south, range 24 east, M. D. B. & M., in Kern County; that the parties to the agreement should aid in the acquisition of said interest but that the

same should stand of record in the name of R. J. White until such time as applications to the United States government for patent to all of said claims should be successfully prosecuted and concluded; that on June 4, 1910, said R. J. White executed a grant deed conveying a one-seventh interest each to H. I. Tupman, Fred V. Gordon, C. V. Anderson, C. F. Haberkern and S. P. Wible, parties to this controversy, and a one-seventh interest to his son, R. E. White; that R. J. White made application to the United States government for patent, which application remained pending until about March, 1922; that pursuant to an alleged conspiracy among the defendants to defraud the plaintiffs of their interests, the defendants, by falsely representing to R. J. White that the plaintiffs were no longer interested, procured an abandonment by R. J. White of the pending application and a conveyance of said land to the United States government, which was the consideration for the lease by it to Pan-American Oil Company of the northerly 1,000 feet of said section 2; that the consideration paid by the Pan-American Oil Company was a royalty to R. J. White of two per cent and a royalty to the defendants of three and one-half per cent of all oil or gas produced therefrom; that oil was developed and produced from the leased land, and that plaintiffs are entitled to a proportionate three-fifths of the royalties paid to the defendants. The answers of the defendants contained denials of the association mentioned and of the allegations of fraud and conspiracy. By their amended answer the defendants Haberkern and Wible admitted the execution and delivery of the deed of June 4, 1910, but alleged that it was made and delivered as to said defendants in confirmation of their original locators' rights and interests to which the plaintiffs were strangers, and that nothing was to be furnished or contributed by the defendants; that on the other hand the deed as to the plaintiffs was in consideration of their joint efforts to prosecute the application of R. J. White for a patent and to procure one Coffin to do the necessary development work upon the land. They also grounded their defense on the alleged fact that the plaintiffs had abandoned their interest in the lands and in the enterprise. They admitted the lease by the United States government of a portion of said section to Pan-American Oil Company, but on a basis of three and one-fourth per cent royalty

to all of the defendants, a portion of which went to the defendant Klipstein for his services.

The issues framed by the pleadings were tried before Hon. T. N. Harvey, judge of the Superior Court, sitting without a jury. After the trial was completed, but before he rendered his decision, Judge Harvey resigned from his office as judge of the Superior Court. Upon stipulation of the parties the exhibits and a transcript of the evidence and proceedings had before Judge Harvey were submitted to Hon. Pat R. Parker, judge presiding, for decision and judgment, and whose findings accorded with the view of the transaction alleged by the defendants. Judge Parker found that the transactions of April 10th and the deed of June 4, 1910, did not constitute a joint adventure; that all interest of the parties to the transaction had been abandoned on February 24, 1921, and their interests in said section 2 on said date relinquished to R. J. White. It was also found that there was no conspiracy nor any false representations and that no fraud or deceit was practiced upon any of the plaintiffs. The judgment for the defendants was accordingly made and entered.

The main contention of the plaintiffs on their appeal from the judgment is that the evidence is insufficient to support the findings and principally the finding that there was not a joint venture among the plaintiffs and the defendants Haberkern and Wible which subsisted at the date when the lease transaction was consummated. If the findings of fact are supported by the record, the plaintiffs' appeal must necessarily fail. Needless to state, the evidence and the inferences to be drawn therefrom present a serious conflict in the record. The appellants make the contention that this court is in the same position in reviewing the evidence to determine whether the findings are supported as was the judge who made his findings and decision from the printed record. In other words, the appellants urge that, in such a case as this, namely, where the record is presented for decision to a trial judge who has not seen the witnesses and heard their testimony, the reviewing court must also determine whether the "deciding judge," as appellants have designated him, was justified in giving weight and credibility to the evidence introduced by the prevailing party; that is to say, that this court itself must determine the credibility

of the witnesses and the weight to be accorded their testimony.

This contention calls for a declaration of the law in effect at this time with reference to the powers of the court on appeal to weigh the evidence and make findings in addition to or contrary to the findings of the trial court.

Prior to the adoption of section 4½ of article VI of the Constitution, in 1914, section 4¾ of the same article, in 1926, and section 956a of the Code of Civil Procedure, in 1927 (Stats. 1927, p. 583), it was firmly established that an appellate tribunal in this state possessed none of the functions of a jury, and that the sole province of the court on appeal was to review the action of the trial court, correct its errors, and thus pass upon questions of law only. This was the established rule at common law. (*Slocum* v. *New York Life Ins. Co.*, 228 U. S. 364 [57 L. Ed. 879, 33 Sup. Ct. Rep. 523, see, also, Rose's U. S. Notes].) In *Bauder* v. *Tyrell*, 59 Cal. 99, it was said: ''The trial court decides as to the facts, the court of review (in this state) as to questions of law only.'' Such has been the unbroken rule since the adoption of the Constitution of 1879. Prior to that time this court had declared in at least two cases that when the testimony in the trial court consisted entirely of depositions, the court on appeal would examine to determine whether the trial court had correctly found the facts therefrom and would not be bound by the rule which forbids a disturbance of the judgment where there is a conflict in the evidence. (*Wilson* v. *Cross & Co.*, 33 Cal. 60; *Lander* v. *Beers*, 48 Cal. 546.) But in 1881, in *Bauder* v. *Tyrell, supra*, and in 1892, in *Reay* v. *Butler*, 95 Cal. 206 [30 Pac. 208, 209], the court adhered to the general rule, the latter case holding that the general rule should govern even as to deposition evidence. We find therein the following significant statement: ''It was said, however, in the opinion of the court in two or three cases, notably in *Wilson* v. *Cross*, 33 Cal. 60, that the reason of the rule is that the court below has the advantage of observing the appearance and bearing of the witnesses, and that such reason does not obtain when the witnesses do not appear personally in court. But it may be well argued that such is not the only reason of the rule; that it is founded in the essential distinction between the trial and the appellate court, and grows out of considerations of jurisdiction; that

it is the province of the trial court to decide questions of fact and of the appellate court to decide questions of law; that this court can rightfully set aside a finding for want of evidence only where there is no evidence to support it, or where the supporting evidence is so slight as to show abuse of discretion." (*Reay* v. *Butler*, 95 Cal. 206, 214 [30 Pac. 208]; 2 Cal. Jur. 912 et seq., and cases cited.) ■ We find no good reason for applying a different rule as between evidence consisting of the transcript of the testimony taken before another judge and deposition evidence. In neither case has the deciding judge the witnesses before him so that he may appraise their credibility, but he has the facts before him, and his findings therein, unless there is no substantial basis therefor, are final. ■ The general rule must be applied in the present cases unless the recent constitutional enactment and legislation above referred to have so modified it as to empower the court to weigh the evidence and in effect become generally a judge of the facts. Certainly section 4½ of article VI of the Constitution, adopted in 1914, does not confer such power. ■ The theory of that section is based upon the assumption that the reviewing court may find error in the record as matter of law, and the effect of the section was to release the reviewing court from the rigid rule that prejudice was presumed from error and to enjoin upon the reviewing court the duty to declare, when confronted in the record with any one or more of the enumerated errors, whether the error found to exist has resulted in a miscarriage of justice, and not to reverse the judgment unless such error be prejudicial. ■ Whether the error found to be present "has resulted in a miscarriage of justice" presents a question of law on the record before the court, and the purpose of the section was to require the court to declare as matter of law whether the error has affected the substantial rights of the party complaining against it, and not for the purpose of determining the evidentiary value of the testimony or where the preponderance of the evidence lies. (*Snyder* v. *Miller*, 26 Cal. App. 566, 575 [157 Pac. 22].)

■ When we turn to section 4¾ of article VI of the Constitution, as adopted in 1926, we find that it is not self-executing. It is a grant of power to the legislature. That section provides: "Sec. 4¾. In all cases where trial by jury is not a matter of right or where trial by jury has been

waived, the legislature may grant to any court of appellate jurisdiction the power, in its discretion, to make findings of fact contrary to, or in addition to those made by the trial court. The legislature may provide that such findings may be based on the evidence adduced· before the trial court, either with or without the taking of additional evidence by the court of appellate jurisdiction. The legislature may also grant to any court of appellate jurisdiction the power, in its discretion, for the purpose of making .such findings or for any other purpose in the interest of justice, to take additional evidence of or concerning facts occurring at any time prior to the decision of the appeal, and to give or direct the entry of any judgment or order and to make such further or other order as the case may require.''

Pursuant to the foregoing grant of power the legislature adopted section 956a of the Code of Civil Procedure at its session in 1927. ˙That section is in the following language: ''In all cases where trial by jury is not a matter of right or where trial by jury has been waived, the supreme court or a district court of appeal may make findings of fact contrary to or in addition to those made by the trial court. Such findings may be based on the evidence adduced before the trial court, either with or without the taking of evidence by the court of appellate jurisdiction, pursuant to such rules as the supreme court may .prescribe.

''The said courts of appellate jurisdiction may, for the purpose of making such findings or for any other purpose in the interest of justice, take, pursuant to such rules, additional evidence of or concerning facts occurring at any time prior to the decision of the appeal and may give or direct the entry of any judgment or order and make such further or other order as the case may require. This section shall be liberally construed to the end, among others, that wherever possible causes may be finally disposed of by a single appeal and without further proceedings in the trial court, except where the interest of justice requires a new trial.''

Following the effective date of the new section this court adopted rule XXXVIII, prescribing the method of procedure for taking additional evidence, either on the court's own motion or on application of a party to the action—in either case on notice to the parties to be affected thereby.

When section 4¾ of article VI was presented for adoption to the electors of the state the argument in its favor (and there was no opposing argument) stated:

"This amendment empowers the legislature to grant to the appellate courts the right in non-jury cases, where a judgment is based on findings of fact which are unwarranted or insufficient, to make new findings and to direct the entry of a different judgment in accordance with the new findings. This will enable the appellate courts to dispose of many cases finally on one appeal, whereas now the appellate court must always send cases back to the trial court for retrial and the making of new findings, even though it conclusively appears from the record what the findings should be.

"The other important power given the legislature is to authorize the appellate courts to take new evidence on appeal concerning matters which occurred prior to trial in the lower court or pending the appeal. It often happens that a litigant neglects to prove some simple fact in the trial court which is essential to his case and which, if he could prove it in the appellate court, would produce a result favorable to him. The right to take new evidence on appeal will also enable more cases to be finally disposed of on the first appeal, and will bring about a more just disposition of cases. The appellate courts will not develop into trial courts because they will undoubtedly exercise this power sparingly and will refer any complicated questions of new evidence to the trial court or a referee for hearing.

"The amendment works for elasticity, simplicity and expedition of procedure."

In line with the purpose of the proposed constitutional amendment, as disclosed by its language and the very appropriate argument in its favor, the legislature incorporated the final sentence in section 956a, as follows: "This section shall be liberally construed to the end, among others, that whenever possible causes may be finally disposed of by a single appeal and without further proceedings in the trial court, except where the interest of justice requires a new trial."

Neither the constitutional amendment nor section 956a of the Code of Civil Procedure was intended to abrogate the general rule respecting the powers of the trial court in its determination of questions of fact or the rule that the reviewing court is bound by the findings of the trial court if

based upon substantial evidence. It is plain that in order to transform or convert appellate tribunals into triers of fact and thus require them to pass upon the credibility of witnesses and the weight and sufficiency of the evidence the intention so to do must be clearly disclosed. The respective provinces of the trial and reviewing courts are so distinct and well defined and of such long standing that in order so to do it must clearly appear that it was the purpose of the new law to uproot the old system and supplant it with a fact-finding appellate system. This we do not believe to have been the purpose of the changes in the law. In other words, it was not the purpose generally to so confuse the functions of the respective courts as to make the findings of the trial courts, when based on substantial evidence, merely recommendations as, for example, the finding of a referee or commissioner.

We arrive at the foregoing conclusion without detracting in the least from what we believe to be the true meaning and purpose of the new law. In the light of the history of the constitutional amendment and the phraseology of the legislation adopted pursuant thereto and having in contemplation the evils or defects in practice and procedure thus attempted to be remedied, we perceive the primary and principal purpose of the change in the law to be that, whenever possible, and the interests of justice would seem to require, the reviewing court should have the power to make new findings contrary to or in addition to those made by the trial court, either on the record presented or on new evidence to be taken under the direction of the court, all with reference to material issues framed by the pleadings, to the end that the judgment or order appealed from may be affirmed and further litigation terminated, and where otherwise under the old practice the judgment or order would have to be reversed. The evils intended to be remedied by this primary and principal purpose of the legislation were, for example, the requirement under the old practice that when the trial court failed to find on a material issue the decision was against law and the judgment or order would have to be reversed (see 24 Cal. Jur., p. 940 et seq., and cases cited); notwithstanding the fact that there existed in the record ample evidence to support a finding in favor of the party prevailing in the trial court if a finding on the issue had

been made and no contrary conclusion from the evidence could reasonably be drawn; in which event, under the new practice, the reviewing court could make the omitted finding, affirm the judgment and thus terminate the litigation. Again, the requirement under the old practice that where the prevailing party had omitted to prove a fact to support a finding in his favor the judgment must be reversed notwithstanding the obvious ability of the prevailing party to prove such fact. In such case the court of review could, under the new practice, order proof of such fact, either on its own motion, or on application of the party interested, make a finding thereon and, if favorable to the prevailing party, affirm the judgment and terminate the litigation. An illustration of the state of the old practice in this regard is found in the case of *Central Sav. Bank of Oakland* v. *Lake*, 62 Cal. App. 588 [217 Pac. 563], where the judgment was reversed because the prevailing party had omitted to prove the formal substitution of trustees in a suit involving the validity of a sale under a trust deed. The case was reversed for that reason and on retrial the proof of the substitution was made (*Central Sav. Bank of Oakland* v. *Lake*, 201 Cal. 438 [257 Pac. 521].) Under the present practice the reviewing court on the first appeal could have taken evidence of the fact omitted to be proved at the trial, made a finding thereon, affirmed the judgment and thus terminated the litigation. Other illustrations might be given, but sufficient have been noted to indicate defects in the old procedure intended to be remedied by the new law to the end "that wherever possible causes may be finally disposed of by a single appeal and without further proceedings in the trial court."

When the reviewing court is importuned by the appellant as in the present case, to make findings on the evidence in the record contrary to the findings of the trial court and to reverse the judgment on the findings so made on appeal and to give or direct the entry of a judgment in favor of the appellant, a more complex situation is presented. ▉ It may not be gainsaid that the language of section 4¾ of article VI of the Constitution, followed *in haec verba* in section 956a of the Code of Civil Procedure, purports in terms to vest in the reviewing court the power "to give" any judgment in the appellate tribunal which the case might seem to require. It needs no argument to support the state-

ment that the power "to give" a judgment is tantamount to the power "to render" or "to pronounce" a judgment. But the power to render a judgment thus purported to be given an appellate tribunal cannot be ·interpreted to mean that the court on appeal would have the power to render *in such court* any judgment which the case on the record might seem ultimately to require. It is beyond question that under the new law the court on appeal may, on the findings made contrary to the findings of the trial court or in addition thereto on the record evidence, or pursuant to new evidence. taken in the reviewing 'court, render such a judgment in the reviewing court as would affirm or modify and affirm the judgment of the trial court, thus terminating the litigation. But if the reviewing court should assume to make contrary or (additional findings, or findings on new evidence taken, and on such findings reverse the judgment and render and enter in the reviewing court a judgment for the appellant, this singular and impossible situation would be presented: The records of the trial court would disclose a judgment for the respondent with no authority in law for the clerk of the trial court to issue process thereon except in accordance. with the terms of the contrary judgment entered in the trial court. The records of the reviewing court would disclose a judgment for the appellant, with no means prescribed by law for the issuance of process out of the office of the clerk of the reviewing court for the enforcement of the judgment.

 The conclusion, therefore, is inevitable that upon a reversal of a judgment the cause must be remanded and further proceedings be taken in the trial court. If the judgment of the reviewing court be a straight order of reversal a new trial must be had upon the going down of the *remittitur*. If the judgment of the reviewing court be an order of reversal with directions to the trial court to enter a judgment in favor of the appellant, the party against whom a judgment for the first time is rendered, namely, the respondent on the appeal, would have the right to move for a new trial or to take an appeal from the judgment so entered, or he might do both. (See *Estate of Baird*, 198 Cal. 490 [246 Pac. 324]; *Klauber* v. *San Diego St. Car Co.*, 98 Cal. 105 [32 Pac. 876]; sec. 963, Code Civ. Proc.) It is true that the new law in terms purports to vest in the reviewing court the power to direct the trial court to enter a

judgment for the appellant. But such direction can be effectual only upon a reversal of the judgment appealed from and, as has been stated, the judgment entered pursuant to such direction does not terminate the litigation. It may be true in a practical sense that the judgment on appeal may so establish the law of the case as to make further proceedings in the trial court or a subsequent appeal from the directed judgment futile. But such has always been the law. Reviewing courts in this state had the power upon reversal to direct the trial court to enter judgment in favor of the appellant long prior to the enactment of the new law under consideration. This power, however, has been exercised sparingly and should be exercised only when, upon a full consideration of the record, the party against whom the judgment is for the first time entered in the trial court could not successfully meet the contentions of his adversary upon a retrial or reconsideration of the case in the trial court.

We are convinced that it was not the intention of the new law that the reviewing courts should develop generally into trial courts; that it was contemplated that the courts of appellate jurisdiction would exercise the new power sparingly and, as a general rule, would exercise it only when the purpose of the new findings was to constitute a basis for an affirmance of the judgment or a basis for a reversal of the judgment with directions to the trial court to enter a judgment for the appellant.

It is obvious that if new findings be made by the reviewing court, and the judgment based on such findings on appeal be a straight order of reversal, or an order of reversal with a remanding for a new trial, the reviewing courts to that extent would be usurping the power of the trial court as an arbitrator of the facts. And if new findings be made as a basis of a reversal, with directions to the trial court to enter a judgment for the appellant, it must appear from the record or from the new evidence taken that on no theory grounded in reason and justice could the party defeated on appeal make a further substantial showing in the trial court in support of his cause.

We therefore conclude, on this branch of the case, that by the adoption of section 4¾ of article VI of the Constitution and the enactment of section 956a of the Code of Civil Procedure it was not intended to convert the appellate tribunals

of the state into triers of fact, nor to abrogate the general rule that findings of the trial court founded on substantial evidence are conclusive on appeal: that the effect of the new law is to create and establish an exception to the general rule; that the primary and principal purpose of this exception is to enable the reviewing courts to make contrary or additional findings on the record presented or on new evidence taken, to the end that the judgment be affirmed or modified and affirmed and the litigation be terminated; that when the judgment appealed from must be reversed and a new trial is ordered, either pursuant to a general order of reversal or a specific remanding of the cause for a new trial, findings of fact by the reviewing court become inappropriate and unauthorized; and that when the judgment appealed from is to be reversed and the trial court is to be directed to enter a judgment for the appellant the reviewing court may make findings in support of the judgment so to be entered, but this power should be exercised with caution, and only when it may be declared, as matter of law, that the respondent could not make a substantial showing in support of his cause if a new trial were had, or that the respondent could not, or should not in the interests of justice, make or be permitted to make a further showing upon a retrial if one should be had. This construction of the new law not only preserves generally the fundamental distinction between the functions of the trial courts and the appellate tribunals, but also affords to litigants and the cause of justice the relief which the recent law intended to afford.

In the light of the foregoing observations as to the powers of the court on appeal, we approach the question of whether the findings of the trial court in favor of the defendants herein are supported by substantial evidence in the record. If we find them so supported the judgment must be affirmed.

Among the facts presented in the record favorable to the defendants, and which, taken as true, fairly and sufficiently support the findings and judgment, are the following: During the year 1910 and prior thereto the plaintiff H. I. Tupman was president of the Kern County Abstract Company in Bakersfield. The plaintiff C. V. Anderson, an attorney at law, was employed as manager and also performed legal services when required. The defendant Klipstein was employed as secretary in charge of the abstracting department. The

plaintiff Fred V. Gordon, throughout these and other transactions, was an associate of the plaintiff Tupman.

The defendants Haberkern and Wible were oil and mining property operators and had known and had had dealings with Tupman and Klipstein for a period of fifteen or twenty years. Prior to 1910, Tupman, Klipstein, Haberkern and Wible had followed the procedure of locating and acquiring public mineral lands of the United States in the naval reserve area known as "Elk Hills," upon the basis of discoveries of gypsum or of fullers' earth. This had become customary because, though the land was reputed to contain oil, prospecting for oil was so expensive and burdensome that locations and applications for patent were being made on the basis of discoveries of fullers' earth, gypsum, or other such placer minerals. Consequently, R. J. White and members of his family, the plaintiff Tupman and the defendants Haberkern, Wible and Klipstein, all made or participated in the making of a large number of locations in eight or more sections in the Elk Hills district. Neither Tupman nor Klipstein participated in any of the Red · Top locations made in section two by locators including R. J. White and members of his family and the defendants Haberkern and Wible. A large group, including Tupman, Klipstein, Haberkern, Wible and members of the White family, laid claim to the largest and most valuable area in the first naval reserve. This group, with the exception of the White family, organized the "Eight Oil Company," and its interests and the so-called "White" interests were segregated, the latter retaining section 2 involved here. Still another independent group in which Haberkern, Wible and Tupman were also interested located a number of claims which have been designated in the record as the "Munzer locations." The plaintiff Tupman conducted much of the detail concerning the transactions among the parties to this controversy. In fact Tupman, Haberkern, Klipstein and Wible were interested extensively in oil and mining transactions. It was in evidence that "Mr. Tupman had handled virtually all of the contracts, papers and details of that nature for all of our Elk Hills matters. Those matters were very extensive. Over a period of about 15 years." The interests of the locators in section 2 were, about April, 1910, deeded to R. J. White for the purpose of his securing a patent title from the United States government in his

name. The defendant Wible testified, "Mr. White, Mr. Haberkern and myself were all located in section 2. My and Mr. Haberkern's title was vested in Mr. White ultimately for him to secure a patent."

About that time the plaintiff Tupman had some negotiations with R. J. White as a result of which he procured for Mr. White a Mr. Coffin to do the development work on the claims in section 2 on a "fifty-fifty" basis, and a contract on that basis was entered into between White and Coffin. On June 4, 1910, R. J. White executed a deed whereby he conveyed a one-seventh interest in the Red Top locations to each of the plaintiffs and the defendants Haberkern and Wible, and a one-seventh interest to his son R. E. White, retaining thereby a one-seventh interest in himself. It was in evidence that this deed was made subject to White's contract with Coffin, and that it remained off the record for the purpose of facilitating application for patent in the name of R. J. White only. As a reason for the fact that Anderson and Gordon were made grantees, it was in evidence that at about that time the plaintiff Tupman stated to the defendant Klipstein that the latter was not declared "in" on the transaction because he, Tupman, had "carried" Klipstein in other deals and that he wanted Anderson and Gordon "in" on this transaction.

The application for patent to the Red Top claims was sent by Tupman to Mr. Perkins, an attorney at law residing in Visalia. The application was contested and an answer to the contest was prepared by Perkins and sent to Tupman to be verified by White. Tupman sent the answer back without the verification and allowed the matter to go by default. An application to have it reopened, however, was made, "when," as Mr. Tupman testified, "the situation had changed somewhat, was more hopeful, looked as if there was a chance to succeed in getting consideration on our Eight Oil application. . . . Prior to that, a number of years ago, we had taken up with Mr. Coffin the question of getting more money. One reason we were so indifferent about this was the absence of anybody to put up money. . . . We anticipated no losses. If our interests matured into something we could dispose of, we naturally would make a profit out of it. Our five-sevenths interest, that is, the five-sevenths interest of the parties to this joint enterprise, was to come to them abso-

lutely clear of any expense for the supervising of the work of Coffin, and the expense of applying for patent, defending any actions brought against us, any protest against the patent, and any other expenses incidental to procuring a patent to the land; we were not to pay for any assistance furnished to Mr. Perkins to enable him to procure patent for this land. That was included in the price that Mr. Coffin paid. Coffin was to pay Perkins for procuring the patent, besides doing all the work necessary for the application for patent. I think the agreement so states. We were not to supervise Perkins also. In return for our five-sevenths interest we in regard to this application for patent were to do whatever we could to help the thing along. You see we had been busy for some time, attempting to get patent for the Eight Oil Company; it took our time and attention. It was understood we would do what we could to assist the matter along.''

The trial court's finding as to the nature of the inception of the enterprise and the character of each person's interest therein is further borne out by a letter written by Mr. Tupman to Mr. Perkins at Visalia, dated June 30, 1911, in which the former states: ''Re Section 2, 31/24. All of the work performed on the above described section prior to the 10th day of April, 1910, was done by and for the original locators. Under date of April 10, 1910, Fred V. Gordon, C. V. Anderson and H. I. Tupman acquired an undivided interest in the section, C. F. Haberkern, R. J. White, S. P. Wible, and R. E. White of the original locators retaining an interest. The consideration for the transfer of interest to the last named parties was a valuable one. H. T. Coffin's interest as you understand, is that acquired under a contract made under which he advanced the additional money needed on the 10th day of April, for the further development of the land. . . . ''

Subsequent to these events the government withdrew from mineral entry the Elk Hills lands in Kern County and created Naval Petroleum Reserve No. 1 in that county. On February 25, 1920, Congress passed what was called the ''Federal Oil Land Leasing Act'' (41 Stats. at Large, 437). Pursuant to that enactment the government, in order to clear that reserve of all clouds, claims and litigation, adopted the policy of making compromise concessions to persons who had

made valid locator's claims within the area by patenting to them other lands, or leasing lands within the reserve for a royalty consideration and a relinquishment of their claims. Throughout the record it is apparent that the White claims for a patent were not considered to have much value for the reason that they were based on fullers' earth discoveries of doubtful merit and for the further reason that it had not been established that claims to a mineral patent could be based on discoveries of fullers' earth. It was admittedly questionable whether the White claims had more than a "nuisance" value by reason of their being an uncanceled cloud on the government's title to section 2 in the First Naval Reserve.

In the fall of 1920 representatives of the Eight Oil Company, of which Tupman, Haberkern, Wible and Klipstein were four of the five directors, were working to effect a compromise with the government "under which the Eight Oil Company by surrendering all of its interest would be enabled to get certain land without dispute and free from any claim, either in the form of a working agreement or lease." The record supports the following brief statement of the history of these efforts: During the negotiations and early in 1921 government representatives required that interests in section 2 of all Eight Oil Company members be surrendered. This was at a time when the claims to section 2 were to be settled along with its own and other claims in the compromise which the Eight Oil Company was endeavoring to effect. About this time Mr. Tupman by telephonic communication with a representative at Washington authorized the representation to government officials that none of the parties hereto who were members of that company, specifically referring to himself, Haberkern and Wible, claimed any interest in section 2. Tupman confirmed his oral representation as to Haberkern and Wible, who appeared in the abstract record as original locators, by a telegram to the title searcher at Washington in Wible's name. There is additional evidence that both Haberkern and Wible represented that they were disclaiming interest in section 2 for the purpose of effecting a compromise of the Eight Oil Company's interests and claims. Tupman testified that he was "working for the interest of the Eight Oil Company" and "didn't want to have that deal held up." It may parenthetically be stated at this point that unques-

tionably the interests of the plaintiffs Anderson and Gordon were controlled by Tupman throughout. A compromise of the claims of the Eight Oil Company, joining with the Munzer, Doheny, and other interests with the exception of the White record interests, was finally concluded in 1921. Tupman, Haberkern and Wible reported to White that they were unable to "get anything for section 2," and apparently that was thought to be an end of the White claims. However, a few months later, a government representative voluntarily stated to Klipstein that a compromise settlement of the locators' rights in section 2 might then be favorably considered for the reason that it had become known to Washington officials that section 2 was being drained by wells belonging to the Pacific Oil Company on section 35 adjoining. Klipstein took the matter up with Coffin and with White, as a result of which a six months' option was given to Klipstein and Wible. Wible agreed to divide his compensation with Haberkern in consideration of the latter's assistance in obtaining the new option agreement from White and Coffin. Their efforts finally were accelerated by the fact that the government called for bids on section 2 and it became necessary immediately to interest some concern or group in bidding for a lease on said section. Klipstein and Wible took up the matter with Pan-American Oil Company, with whom they made the following agreement:

"For and in consideration of one dollar ($1.00), the receipt of which is hereby acknowledged, we hereby agree that in case you make a compromise with the Government under the claim of R. J. White, on section 2–31–24, Elk Hills, within thirty days (30) from date, we do hereby agree to have all interest of R. J. White and H. T. Coffin, in above mentioned lands, quitclaimed to yourself or the Government, for the consideration of your agreeing to pay us seven and one-half per cent royalty, out of which we agree to settle in full with R. J. White and H. T. Coffin. This gives you an exclusive option for thirty days (30) from date, of the R. J. White claim upon this section of land (2–31–24).

"T. E. KLIPSTEIN.
"S. P. WIBLE."

With this instrument and the option agreement to Klipstein and Wible signed by White and Coffin, the Pan-American Oil Company succeeded in having its bid for a

lease of the northerly 1,000 feet of section 2 accepted. This transaction terminated the so-called "White interests" in section 2.

The appellants assign forty specifications or particulars in which they claim the evidence is insufficient to justify the findings and decision. But a careful review of the evidence printed in the bill of exceptions and consideration of the arguments of counsel does not disclose that the evidence is insufficient to support the findings. The conclusion or theory amply supported is that if any joint enterprise was created by the transaction of June 4, 1910, its purpose and object was frustrated largely by the government's withdrawal from mineral entry lands in the Elk Hills district and the navy department's contesting the locators' claims theretofore made to those lands. It was recognized by all the parties that the White claims thereafter constituted but a questionable cloud on the government's title, which in fact had so little value in the estimation of the government officials themselves and the parties hereto that those interested outside of White preferred to disclaim or abandon any claimed interest rather than hold up a settlement of claims in which they were also interested and which appeared more likely to produce returns. So lightly did the government consider the White claimants that it called for bids on section 2, and the only chance which White had to obtain anything for his interest in section 2 was to act on the suggestion made to and followed up by Klipstein, without any evidence of a conspiracy or an intention to cheat, that a "trade" with the government might better be accomplished by a prospective bidder who could offer a relinquishment of the White claims, which, it is fair to assume under the evidence, initiated an entirely new venture concerning these claims or interests after the abandonment thereof by all concerned except White. (See *Commercial Bank* v. *Weldon*, 148 Cal. 601 [84 Pac. 171].)

Furthermore, if it be assumed, as contended by the plaintiffs, that a joint enterprise originally existed, the personnel of that original joint adventure was not perpetuated. The original group included R. J. White, the plaintiff Tupman and the defendants. Upon the execution of the deed of June 4, 1910, R. J. White took title to the Red Top claims in trust for his grantees under the unrecorded deed. The per-

sonnel of the joint enterprise thereby became crystallized in R. J. White and his son R. E. White, the plaintiffs and the defendants other than Klipstein. By the deed of June 4, 1910, Klipstein was eliminated. Tupman testified that he told Klipstein at the time that he was not included in the new arrangement. Klipstein apparently considered himself out and has made no contention to the contrary. He was thereafter in position to deal with freedom with any one or all of those interested in the ''White'' claims. The difficulties of the Eight Oil Company finally were adjusted and the government's title to section 2 had been cleared except as to the nebulous claims of the beneficiaries under the title held by R. J. White, and Klipstein was not one of them. The United States government desired to lease section 2 or a portion thereof for the reason that the oil-wells on section 35 adjoining and belonging to the Pacific Oil Company were draining section 2. One of the attorneys in the department of justice attending to legal matters on behalf of the federal government in connection with clearing the title to section 2 knew of the claims of R. J. White and his associates and suggested to Klipstein that it would be of advantage in awarding the lease on section 2 if the so-called ''White'' claims could be cleared up at the same time. Klipstein thereupon saw Mr. Coffin in Los Angeles, who admittedly had acquired a one-half interest in whatever White and his associates claimed. Thereafter, under date of May 17, 1921, a written option was given to Klipstein, signed by Coffin and R. J. White, agreeing to transfer to Klipstein one-half of what Coffin and White might recover on the settlement of the latter's claims. This option was to run for a period of six months from its date. When the six months was about to expire, Klipstein desired to obtain a renewal of the option, but further handling of the matter entailed additional expense. Whereupon he made a proposition to Wible that if Wible would go in with him he would share the proceeds, if any, with him. The two went to Los Angeles and obtained an extension of the option running, however, to both Wible and Klipstein. Some time thereafter the Secretary of the Interior sent out letters calling for bids on a strip of land on section 2. Klipstein and Wible endeavored to enlist the interest of Mr. J. C. Anderson of the Pan-American Oil Company in obtaining an adjustment of the claims of White

and Coffin in and to said lands. Upon the agreement of Haberkern to share Wible's expense in the matter, the latter agreed to divide whatever the former might realize.

The transactions of the parties need not be further recounted. Suffice it to say that there is ample evidence in the record that whatever joint enterprise existed in the first instance had been abandoned long before Klipstein's activities in obtaining the options. Furthermore we find no basis for the contention of the plaintiffs that the evidence is insufficient to support the finding that the defendants were not guilty of any fraud in connection with their dealings with the plaintiffs or with the so-called White and Coffin interests.

The judgment is affirmed.

Richards, J., Langdon, J., Waste, C. J., Seawell, J., and Curtis, J., concurred.

PRESTON, J., Concurring.—I concur. But I think it should be emphasized that the door is open to appellants and respondents alike to ask for the introduction of new evidence or a reconsideration of the evidence already in the record.

I agree that in the matter of the introduction of new evidence and the making of new or contrary findings, the power should be sparingly exercised and that unless it can be seen that controlling questions will be thereby introduced, all such applications should be denied.

I agree further that in a certain sense formal findings are not necessary or appropriate in causes where a reversal is ordered. But the order of reversal upon the new evidence, or on a reconsideration of the evidence, is tantamount to a finding for the appellant. In such a case, the proper practice in most instances would seem to be to direct the proper judgment to be entered by the trial court. If the opportunity to resort to the new procedure is equal and coexistent between the litigants and is restricted to the consideration of only such questions as will determine the course of the litigation, I see no reason why this innovation may not work for justice and the dispatch of causes pending in the courts.