# CHARLESTON.

THE CITY OF WELCH *v.* NORFOLK & WESTERN RAILWAY COMPANY

(No. 5968)

Submitted September 14, 1927.   Decided December 13, 1927.

1. **EMINENT DOMAIN** — *Statute Requiring Determination in Equity of Necessity of Proposed Crossing Before Condemnation Does Not Apply to Municipal Corporations (Code, c. 42; c. 52, § 11).*

   Section 11, Chapter 52, Code, requiring a railroad to go into equity to determine the necessity of a proposed crossing before exercising the right of eminent domain, does not apply to municipal corporations.   (p. 664).

   (Eminent Domain, 20 C. J. § 113.)

2. SAME—*City's Power to Establish Streets, with General Power to Condemn, Gives Right to Cross Railroad Track at Grade to Connect Ends of Two Streets (Acts 1919 [Municipal Charters] c. 4, § 28).*

The authority conferred by charter to lay off and establish streets within its corporate limits, coupled with a general power to condemn, by necessary implication gives the city the right to cross the tracks of railroads at grade, when it is necessary to do so for the purpose of connecting the ends of two streets, since the new use will not destroy the previous use, and both may be enjoyed together without unreasonable impairment of either.    (p. 665).

(Eminent Domain, 20 C. J. § 97.)

3. SAME—*On Constructing Grade Crossing, Railroad is Entitled to Compensation for Diminished Value of Rights in Land and for Making and Maintaining Structural Changes in Roadbed and Track, Except Changes Required Under Police Power or Constitutional Reservation of power to Alter or Amend Corporate Charters.*

Where a new highway is laid. out and opened across a railway track, the railway company is entitled to compensation for the diminished value, if any, of its rights in the land on account of the establishment of the new way, and the cost of making and maintaining such structural changes in its roadbed and track as become necessary in order to protect and preserve its track for the old use, .notwithstanding the new use, except, however, such changes as are required by law under the police power of the state, or the constitutional reservation of power to alter or amend corporate charters.    (p. 666).

(Eminent Domain, 20 C. J. § 197.)

4. RAILROADS—*Legislative Authority Under Police Power Extends to Matters Necessary to Safe Crossing of Railway by Highway.*

Legislative authority under the police power of the State extends to all matters necessary to a safe crossing of a railway track by a highway, without regard to whether exercised before or after the construction of the railroad, or before or after the construction of the highway, or whether the highway existed at the time of the construction of the railroad, or was thereafter constructed across it.    (p. 668).

(Constitutional Law, 12 C. J. § 426; Railroads, 33 Cyc. p. 674 [Anno].)

5. SAME—*Legislature, Under Police Power, May Require Gates and Watchmen at Railroad Crossings.*

The requirement for the construction and maintenance of

crossing gates and the hiring of watchmen are equally proper subjects for police regulations when the legislature shall see fit to exercise its authority in that regard.    (p. 669).

(Railroads, 33 Cyc. p. 673.)

6.   EMINENT DOMAIN—*Interruption of Railroad's Business by Opening Highway Across Tracks, or Increased Expenses and Risks in Running Trains, Are Not Grounds of Damages.*

Damages are not assessable for the interruption and inconvenience occasioned to the business of the railroad by the opening of a new highway across its tracks, nor for increased expenses, nor increased risks in running its trains occasioned thereby.   These matters are within the realm of police regulation, damages for which would be too vague and uncertain for calculation. . (p. 671).

(Eminent Domain, 20 C. J. § 199.)

7.   SAME—*Uncompensated Obedience to Regulation for Public Safety Under Police Power is Not Taking or Damaging Without Compensation of Private Property, or Private Property Affected with Public Interest.*

Uncompensated obedience to a regulation enacted for the public safety, or which may hereafter be enacted, under the police power of the State, is not a taking or damaging without just compensation of private property, or private property affected with a public interest.    (p. 672).

(Eminent Domain, 20 C. J. § 6.)

(NOTE:   Parenthetical references by Editors, C. J.—Cyc. Not part of syllabi.)

Error to Circuit Court, McDowell County.

Condemnation proceeding by the City of Welch against the Norfolk & Western Railway Company and others, for an easement for street purposes across the railroad's tracks and right of way.   From a finding of the viewers appointed to assess damages, both plaintiff and defendant appealed to the circuit court, which gave judgment for the Railway Company, based on a verdict for $1,000, and the Railway Company brings error.

*Affirmed.*

F. M. *Rivinus, Holt, Duncan & Holt,* and *Strother, Sale, Curd & Tucker,* for plaintiff in error.

B. F. *Howard,* for defendant in error.

WOODS, JUDGE:

The Norfolk & Western Railway Company complains of the ruling of the circuit court of McDowell county in a certain condemnation proceeding, instituted by the City of Welch, wherein the city obtained an easement for street purposes across the carrier's tracks and right-of-way.

In order to provide the residents of Woodmont Addition with a safe, convenient and adequate means of access to and from the schools, churches and business section of the city, the officials of the City of Welch decided to construct a concrete bridge over Elkhorn River at a point directly opposite the foot of Slant Street, considered the most direct and feasible route. Bonds were voted to finance this project, but the actual construction of the bridge has been held up pending the outcome of the present condemnation proceedings. According to an actual census, 1,762 people reside in Woodmont Addition. These people, in order to reach the city, must either cross the Norfolk & Western tunnel by way of a narrow nine-foot road cut in a ledge of rocks on the mountainside, with an almost perpendicular drop of from seventy-five to one hundred feet down to the railroad tracks bordering Elkhorn River, or by way of Slant Street. It is shown in evidence that vehicles have for years been suffered to cross the tracks a short distance east of the proposed crossing, and that many school children, as well as other pedestrians, daily, cross the tracks any place between such vehicular crossing and the proposed crossing.

To locate the crossing where it is sought to be located would provide the inhabitants of Woodmont Addition with a direct outlet by way of the contemplated cement bridge (the construction of which would be impracticable if the crossing is denied) into the paved road leading to the residential, business and school sections of the city. The proposed crossing is to be at grade, the west limit at a point 280 feet east of the tunnel. At this point it will cross two main line freight tracks which pass through the tunnel, one main passenger track, running around the tunnel to the passenger station, and two switch tracks. Divers citizens and officials of the municipality testify to the

necessity for the establishment of the proposed crossing; that no change would be required in the present bed of the railway company; that the bridge was to be constructed so as to make access to and from the crossing safe.

The railway company seeks to show the absence of a necessity for such crossing; that its tracks are all in active use, and that on an average of fifty trains per day, passenger and freight, pass over these tracks, which are in constant and necessary use and occupancy by it; that the proposed crossing would be located so near to the eastern portal of the tunnel in question that, in consequence, such a grade crossing would be dangerous, both to the railway company and to the public. It further seeks to show that after the establishment of the proposed crossing it could not operate its railroad with any degree of safety, either to itself or to the public, without the expense of the installation and maintenance of gates, and the hiring of watchmen; nor could it avoid the expense of cutting its trains standing in and extending beyond the tunnel over the crossing without a violation of the criminal statutes of the state; that such expenses as were detailed by its witnesses were literally and unavoidably necessary to prevent further injury to the property of the defendant and render it fit for enjoyment, and such taking was tantamount to the taking of property without due process of law; and that the railway company had made a proposition of building an underground crossing on a fifty-fifty basis—that is, the railway company to pay one-half and the city one-half—and that the estimated cost thereof was $60,000.00. The reviewers, appointed under the statute, to assess the damages for the lands or interest proposed to be taken, as well as damages to the residue, assessed the same at $15,000.00. Both the plaintiff and the defendant appealed to the circuit court from this finding, and on the trial thereof, the jury returned a verdict of $1,000.00. From this latter hearing the railway company appeals to this Court.

The several assignments of error relate to the necessity for an initial application to a court of equity, and to the proper elements of damage.

Counsel for the railway company insist that an application to a court of equity for a decree determining the propriety of the crossing is a necessary condition precedent to the city's right to condemn a right-of-way, or crossing, over its property, which is already devoted to a public use. And in support of this they cite Sec. 11, Chapter 52, Code, and seek to show that it is a necessary supplement to Chapter 42, relating to condemnation proceedings, and that it governs and regulates the rights of municipalities just as it governs and regulates the rights and duties of the public corporations mentioned in Chapter 52. While Chapter 52 relates to corporations generally, Section 11 thereof provides in effect *that if any railroad,* turnpike or canal company, or any company organized for the purpose of transporting carbon, oil or natural gas deem it necessary *to cross any other railroad,* turnpike or canal or pipe line, it may do so, under certain conditions; that, if the parties fail to agree, the company desiring it may bring suit in equity, and in such suit the court may, in a proper case, decree that such may be made upon payment of damages to be ascertained as provided in Chapter 42, Code, and the company may proceed under the latter named chapter to obtain the right to make such crossing. And then counsel go a step farther and contend that, since the city in this case is not given express authority by its charter to acquire property already devoted to a public use by condemnation proceedings, it must proceed in equity under said Section 11, Chapter 52, Code, if at all—that being the only express authority for such action. This issue was raised by a demurrer to the application, which was overruled, and also by the court's refusal of certain pleas setting up the same defense. Every contract made with the State is subject to its right of eminent domain. Such a taking does not impair the obligation of any contract, it being an implied condition of all grants by the state that the property conveyed shall be subject to the power of eminent domain. In contracting with railroads and the like, the State retains a right to condemn a crossing over the same whenever and wherever the public necessity requires. The City of Welch as a municipal corporation is an arm of the State for local governmental

purposes, and is given subordinate and local powers of legislation. Under the Acts of 1919 (Municipal Charters), Chapter 4, §28, the City of Welch is given authority to acquire, by eminent domain, any real estate in or out of the city necessary for any public purpose, or necessary in the exercise of any powers granted therein, including the power to "lay out, open" and straighten streets, etc. And it is provided further that this right to condemn may be used to the same extent and upon the same conditions as such power is conferred upon public corporations by chapter forty-two of the Code of West Virginia. Under this section the City of Welch is expressly given the right to take private property for public purposes in the same manner as any other corporation. But can the city take property already dedicated to a public use without express authority is conferred by its charter to do so? While the charter does not say so in so many words, the right is nevertheless conferred by necessary implication. It would be a very narrow view of the charter to hold that it conferred the power to "lay out" or "open" a street to the line of a railroad, but not the authority to cross it. We think that it follows, as a necessary consequence of the city's powers to condemn, that this power may be exercised, not only upon private property, but upon property devoted to a public use, especially when both of the uses may be enjoyed at the same time without unreasonable impairment of either. 3 Elliott on Railroads (3d ed.) §1566; 2 Lewis on Eminent Domain (3d ed.) §417; *Chicago, B. & Q. R. Co.* v. *Chicago,* 116 U. S. 226; *Illinois C. R. Co.* v. *Chicago,* 141 Ill. 586; *Louisville & N. R. Co.* v. *Louisville,* 131 Ky. 108; *Chicago, M. & St. P. R. Co.* v. *Starkweather,* 97 Iowa 159; *Lake Erie & W. R. Co.* v. *Kokomo,* 130 Ind. 224; *Hannibal* v. *Hannibal &c. R. Co.,* 49 Mo. 480; *Bridgeport* v. *N. Y. &c. R. Co.,* 36 Conn. 255; *St. L. S. F. R. Co.* v. *Fayetteville,* 75 Ark. 534; *Chicago & N. W. R. Co.* v. *Morrison,* 195 Ill. 271; *Poulan* v. *Atlantic Coast Line R. Co.,* 123 Ga. 605; *Southern Kansas R. Co.* v. *Oklahoma City,* 12 Okla. 82; *Philadelphia W. & B. R. Co.* v. *Philadelphia,* 9 Pa. 563.

The power to "lay out" or "open" streets, which has been delegated to the City, is legislative in nature, and the city's

conclusion and determination as to the propriety and necessity of a proposed street is as final and conclusive as though the Legislature itself had determined the same. Such questions are not open to judicial review. The necessity having been determined, the only means by which the right of the applicant may be defeated is by showing that said crossing will essentially impair or destroy the use of the carrier's property for railway purposes. (See cases cited above). We cannot see wherein Section 11, Chapter 52, Code, has application to municipal corporations, as the language of that section clearly imports it was enacted to afford *one quasi-public corporation protection from unnecessary damage and inconvenience by another internal improvement corporation in its use of eminent domain.*

The remaining questions relate to the question of damages. In the present case the city does not propose to take the land granted to the railway for a right-of-way. It is not proposed to prevent the railway company from using it and maintaining its tracks, and any other improvements thereon that are not entirely inconsistent with its use as a highway crossing, and its use for all purposes for which it is held by the company will be interfered with only so far as its exclusive employment for railroad purposes is interfered with, and such use for the purpose of the street being exercised jointly with the use by the company for railroad purposes. For this reason it is immaterial whether the railroad's right-of-way is owned in fee simple or not. The rule as to compensation is necessarily not the same as where the land is taken or its exclusive use appropriated. As already stated, the railroad acquired its right-of-way subject to the right of the State to extend its public highways and streets across the same. However, it is entitled to compensation. 10 R. C. L. 148. And according to the text, "The true measure of damages, it is generally held, is the difference between the value of the right to the exclusive use of the land in question for the purposes for which it was being used, and for which it was always likely to be used, and that value after a municipality or other corporation acquires the privilege of participating in its use, by the opening of a street across it leaving the

railroad tracks undisturbed.'' In this, it is supported by the case of *Chicago, B. & Q. R. Co.* v. *Chicago, supra,* and decisions from a majority of the states. See note in 15 Annotated Cases 10, and 22 L. R. A. (N. S.) 1. Accordingly, if a railroad company is obliged to remove or abandon the use of any structure or sidetrack which come within the highway location, it is entitled to compensation for such loss, and, furthermore, it is entitled to compensation for the cost of making such structural changes in its road bed and track as are necessary to preserve the track for its former use. *Baltimore* v. *Cowen,* 88 Md. 447. And the courts of most of the states hold, with the exception of Michigan and Kansas (which have intrenched upon this doctrine), that for expenses incident to the erection and maintenance of crossing gates, sign boards, electric bells, and the like, including the salary of flagmen, the railroad is not entitled to an allowance. Such expenditures, being required either for the protection of the company in running its trains or of the public using the street at such crossing, are expenses incident to a compliance with police regulations. *Chicago, B. & Q. R. Co.* v. *Chicago, supra.* (see Rose's Notes to this case); *Chicago & N. W. R. Co.* v. *Chicago,* 140 Ill. 309; *Lake Shore & M. S. R. Co.* v. *Chicago,* 152 Ill. 101; *Chicago & N. W. R. Co.* v. *Morrison, supra; Paris* v. *Cairo V. & C. R. Co.,* 248 Ill. 213; *Louisville & N. R. Co.* v. *Louisville, supra; Baltimore* v. *Cowen, supra; In re Morris & E. R. Co.,* 9. N. J. L. 75; *Morris & E. R. Co.* v. *Orange,* 63 N. J. L. 252; *Chicago, M. & St. P. R. Co.* v. *Milwaukee,* 97 Wis. 418.

Let us make application of the foregoing principles to the case under consideration. Structural changes, as defined by the decisions, include the removal of switches and switch stands *(Central R. Co.* v. *Bayonne,* 51 N. J. L. 428; sidings required to be shortened *(Southern Kansas R. Co.* v. *Oklahoma City, supra;* rebuilding parts of its platforms and removal of company store-house *(Chicago & N. W. R. R.* v. *Morrison, supra);* cost of a bridge or viaduct to carry trains over street *(C. H. & D. R. Co.* v. *City of Troy,* 68 Ohio St. 510)*; and elevation of its tracks, so as to make them con-

form to the grade of highway. It appears that damages of the nature of those enumerated, accruing by reason of what the courts denominate "structural changes", were not sought to be shown in evidence. So further comment on this phase of the case is unnecessary. As the record stands and was presented, we do not think it proper to discuss any fundamental questions not necessary to a decision of the questions specifically raised. While some suggestions were made in conference which are not lacking in force, we are not disposed to enter ourselves upon a search and comparison of all the provisions of law that may have a bearing on possible cases.

There is complaint of the rejection of certain evidence proffered on behalf of the railway company, the purpose of which was to show the resultant damages to the railroad company by reason of the facts that the company would be required, because of the proximity of the crossing to the portal of the tunnel, to go to the expense of hiring watchmen, installing and maintaining gates, and cutting of trains, which expense according to defendant, would continue *ad infinitum;* the estimated cost thereof per annum being $21,450.00, which sum, capitalized on a six percentum basis would amount to more than $350,000.00. The city contends that these items, as well as other things ordinarily required at railway crossings, especially in populous communities, are matters pertaining to the public safety and are within the police power of the state and municipality. And the court's ruling was based on that theory. That they fall within the class of expenses not allowable, as already adverted to, is very apparent. It is true many of the decisions buttressing this doctrine were based on a statute existing at the time of the condemnation, carrying into effect the police power. But are these decisions any the less binding under the circumstances here? We think not. Our State has not seen fit to carry into effect by enactment into law provisions requiring railway companies to erect and maintain gates, or to provide watchmen at public crossings—under that power which has been termed as being coextensive with self protection and is not inaptly termed the law of overruling necessity. Neither has the municipality of Welch done so. We have said, however, that the exercise

of such power essentially inheres in all legislative agencies of the State. *Sutherland* v. *Miller,* 79 W. Va. 796. Therefore, laws of this nature may be enacted by the city or state whenever the public exigencies and safety of the community demand it. The plaintiff in error took its charter subject to the power of the State to provide for the safety of the public, in so far as the safety of the lives and persons of the people were involved in the operation of the railroad. The company laid out its tracks subject to the condition necessarily implied that their use could be so regulated by competent authority as to insure the public safety. And as all property, whether owned by private persons or by corporations, is held subject to the authority of the State to regulate its use in such manner as not to unnecessarily endanger the lives and the personal safety of the people. It is not a condition of the exercise of that authority that the State shall indemnify owners of property for damage or injury resulting from its exercise. Mr. Justice Harlan in the case of *Chicago, B. & Q. R. Co.* v. *Chicago, supra,* after quoting decisions to the effect that no damage could be claimed, either by a natural person or a corporation, on account of being compelled to render obedience to a police regulation designed to secure the common welfare said: "We concur in these views. The expenses that will be incurred by the railroad company in erecting gates, planking the crossings, and maintaining flagmen, in order that its road may be safely operated—if all that should be required— necessarily result from the maintenance of a public highway under legislative sanction, and it must be deemed to have been taken by the company into account when it accepted the privileges and franchises granted by the state. Such expenses must be regarded as incidental to the exercise of the police powers of the state." The same court in a recent case held that a railroad company gained no vested right to the retention of a general rule of law, laying the expense of installing and maintaining required safety devices, in existence at the time of its charter; and it is not deprived of its property without due process by the change of such rule placing an additional burden upon it. *Northern Pacific Railway Co.* v. *Puget Sound & Willapa Harbour R. Co.,* 250 U. S. 332. In

its opinion in the last mentioned case the court, referring to the question in issue, said: ''Obviously this is a slender thread on which to hang a grave constitutional argument, and it is difficult to treat it seriously.'' We have statutes requiring erection of sign-boards and cutting of trains at railroad crossings. But, if we concede that the Legislature or the city has not already imposed the duty of the railroad to construct a crossing and keep it in repair as a police regulation, yet as the Legislature or city may do this at any time, as the circumstances may require, it follows that those matters embraced in the performance of such duties are not elements of damage in the case. In line with this principle is the holding in the *Chicago, M. & St. P. R. Co.* v. *Milwaukee, supra.* This case held that in the absence of a statute requiring crossing-gates, the expense of erecting, maintaining and operating them is not recoverable, they being proper subjects for police regulation when the Legislature should see fit to exercise its authority in that regard. So we think that, upon principle and by clear weight of authority, where a new highway is laid out and opened across a railroad track, the railway company is entitled to compensation for the diminished value of its easement in the land on the account of the establishment of the new way, and the cost of making and maintaining such structural changes in its road bed and track as becomes necessary in order to protect and preserve its tracks for the old use, notwithstanding the new use, except, however, such changes as are required by law under the police power of the State, or as may be enacted under the constitutional reservation of power to alter or amend corporate charters.

It is not questioned by the city that some damages are recoverable by the railroad; and such is the law. But damages are not assessable for the interruption and inconvenience occasioned to the business of the railroad by the opening of the new highway, nor for increased expenses or increased risks in running their trains occasioned thereby. According to proffered testimony of the utility this damage was estimated to amount to hundreds of thousands of dollars. The very amount insisted upon proves the fallacy of the claim. These matters are clearly within the realm of police regulation, dam-

ages for which would be too vague and uncertain for calculation. *P. & R. R. Co.* v. *Deering,* 78 Me. 61; *Mass. Central. R. Co.* v. *Railroad,* 121 Mass 124

The railroad maintains that the damages assessed by the jury were grossly inadequate, and were based upon insufficient and improper evidence offered by the applicant. More than nominal damages were allowed. While none of the witnesses for the city placed the damages as high as those returned by the jury, may we not conclude that the jury acted in the light of the view taken of the premises? This is allowable. *Monongahela Valley Tract. Co.* v. *Windom,* 78 W. Va. 390. This view was taken by the jury at the instance of the plaintiff in error here. If the damages were awarded by a jury, they will not be disturbed where the evidence was conflicting and the jury viewed the premises. *Monongahela Valley Tract. Co.* v. *Windom, supra; Baltimore & Ohio R. R. Co.* v. *Bonafield,* 79 W. Va. 287.

The final point of error stressed is that the denial by the Court of the right of the defendant to show the whole or any of the damages directly resulting to it through the taking, which is sought to show, was tantamount to the taking of private property for public use without just compensation. At the risk of repetition, we conclude that uncompensated obedience to a regulation enacted for the public safety, or which may hereafter be enacted, under the police power of the State, is not a taking or damaging without just compensation of private property, or private property affected with a public interest. See *Mugler* v. *Kansas,* 123 U. S. 623; *Boston & Maine R. Co.* v. *York County Com'rs.,* 79 Me. 376; *Thorpe* v. *Rutland & B. R. Co.,* 27 Vt. 150; *State* v. *Chicago, B. & Q. R. Co.,* 29 Nebr. 412; *N. Y. & N. E. R. Co.* v. *Waterbury,* 60 Conn. 1.

*Affirmed.*