[Civ. No. 8009. Second Appellate District, Division Two.—September 28, 1933.]

CITY OF LONG BEACH (a Municipal Corporation), Appellant, v. HARRY S. WRIGHT et al., Defendants; PACIFIC ELECTRIC RAILWAY COMPANY (a Corporation) et al., Respondents.

[Civ. No. 8008. Second Appellate District, Division Two.—September 28, 1933.]

CITY OF LONG BEACH (a Municipal Corporation), Appellant, v. CLARK D. HALL et al., Defendants; PACIFIC ELECTRIC RAILWAY COMPANY (a Corporation) et al., Respondents.

Nowland M. Reid, City Attorney, and George W. Trammell, Jr., Harlan V. Boyer and John O. Palstine, Deputies City Attorney, for Appellant.

Frank Karr and C. W. Cornell for Respondents.

ARCHBALD, J., *pro tem.*—This action was brought by the City of Long Beach, under the "Street Opening Act of 1903", to condemn for the public use a strip of land approximately 60 feet wide, extending from the intersection of Anaheim Street and American Avenue in Long Beach to the south line of Willow Street, where it intersects American Avenue, and used by defendant Pacific Electric Railway Company as a portion of its private right of way between the cities of Long Beach and Los Angeles. The length of such strip, including street intersections, involved in the Wright case is 5,370 feet, and in the Hall case 2,480 feet. On each side of the strip are streets now known as "American Avenue", and the purpose of the proceeding is to widen that thoroughfare for the public use by extending said use to the land occupied by said strip. The portion of the right of way involved in the Wright case is intersected and crossed by seven streets and that in the Hall case by one street. The map in the Wright case shows seven streets entering

American Avenue which do not cross the private right of way, and the Hall case five.

The cases were consolidated for the purpose of trial. Respondents demanded a trial by the court, and referees were appointed to recommend the compensation to be awarded the defendants waiving such trial. The written report of such referees, filed in court, awarded nominal damages of one dollar to each of the defendants appearing to have some claim to the fee or reversionary interests if the land should be used for other than railway purposes.

The trial of the issues between plaintiff and the respondents here, Pacific Electric Railway Company, Wells Fargo Bank & Union Trust Company and Chemical Bank & Trust Company, was had before Judge Hazlett, who filed a preliminary opinion on the evidence, directing plaintiff· to prepare, serve and present to the court findings in conformity therewith. Such findings were prepared. Amendments to such findings were prepared by respondents, proposing in the main a material increase in the award to them, apportioned to the thirteen parcels described in the complaint, and the matter of their adoption was argued before Judge Hazlett, who refused them except in so far as they were incorporated in the findings filed. Interlocutory judgments based on such findings by Judge Hazlett were duly signed and filed. On December 31, 1930, respondents filed notices of intention to move for a new trial. Judge Hazlett's term of office having expired before such motions could be heard, Judge Collier was designated by the presiding judge to hear them, and on February 20, 1931, after argument thereon, an order was made by Judge Collier amending finding No. XXIV of the findings signed by Judge Hazlett in the Wright case, by changing the award made by the latter of $68,400, as the value of the property belonging to respondents sought to be condemned, to $451,185.07, apportioned to thirteen parcels where the award by Judge Hazlett was a lump sum, the property belonging to respondents being treated as one parcel, and making corresponding changes in the conclusions of law and interlocutory judgment filed. In the Hall case a similar order was made, changing the award from $31,600 to $135,084.95, apportioned between three parcels, where the first award treated all the interest involved as one parcel, and making the same change in the

conclusions of law and interlocutory judgment. Such changes were made in the findings and interlocutory judgment signed and filed by Judge Hazlett. The orders also denied the motions for new trial made.

Plaintiff has appealed from said interlocutory judgment as amended by said order, from the order amending said findings and judgment and, out of a superabundance of caution, from the interlocutory judgment as signed by Judge Hazlett. Appellant does not question the awards made by Judge Hazlett, however.

Appellant contends: (1) that Judge Collier had no authority on the hearing of the motion for a new trial to increase the amount of the award made by Judge Hazlett on conflicting evidence, and erred in so doing; (2) that Judge Collier erred in using evidence as to the value of the fee as the measure of respondents' damage.

■ (1) Respondents urge that a judge who did not preside at the trial but who is designated under section 661 of the Code of Civil Procedure to hear a motion for new trial may exercise all the powers of the court in connection therewith as provided in section 662 of the Code of Civil Procedure. Section 661 provides that in case of the inability of the judge who tried the case to hear such a motion it shall be heard and determined by any other judge. Section 662, so far as material here, provides: "In ruling on such motion in a cause tried without a jury the court may . . . change or add to the findings, modify the judgment, in whole or in part, vacate the judgment, in whole or in part, and grant a new trial on all or a part of the issues."

It has long been the law of this state that "a party litigant is entitled to a decision upon the facts of his case from the judge who hears the evidence, where the matter is tried without a jury", and that "he cannot be compelled to accept a decision upon the facts from another judge". (*Guardianship of Sullivan*, 143 Cal. 462, 467 [77 Pac. 153, 155]; *DeMund* v. *Superior Court*, 213 Cal. 502, 505 [2 Pac. (2d) 985]; *Hughes* v. *DeMund*, 96 Cal. App. 365, 368 [274 Pac. 405].) In the last-cited case it was urged that a judge other than the one hearing the evidence may weigh the evidence and decide according to its preponderance in determining a motion for a new trial. With this contention the appellate court was in accord, but said (p. 370): "If

the motion is denied, however, an appeal may be taken from the original judgment, rendered by a judge who heard the evidence. If a new trial is granted, the case will be decided again by a judge who hears the evidence. But in this case the judgment was rendered by a judge who did not hear the greater and more important part of the evidence.'' In the award of damages as changed and made in the instant case the judge who made the changes heard none of the evidence and yet made a very substantial increase in the award, on extremely conflicting evidence, over that made by the judge who heard all of the evidence. On principle there would seem to be little difference to a litigant in being compelled to take findings and judgment in the first instance from a judge who did not hear the evidence but read the transcript, and in having such a judge make new and different findings to support a different judgment entered on a motion for new trial, thus substituting his conclusions for those of the judge who heard the evidence. Such a judge has the right to weigh the evidence and decide as to its sufficiency to support the judgment entered, but to give him the power to change the findings and enter a different judgment on conflicting evidence would be to give him a conclusive right of review not even claimed by appellate courts under legislation based upon a constitutional grant of power much clearer in expressing such an intent than is the section under which the power is claimed here.

Prior to 1927 findings could not be changed after judgment by any court, trial or appellate, even though such act involved only the adding of findings supported by the evidence which were necessary to support the judgment. A retrial of the issues of fact, after the granting of a motion for a new trial by the trial court or a reversal of the judgment on appeal, was necessary to obtain relief for an apparently successful litigant who had proved his case to the satisfaction of the trial or appellate court, but the fruits of whose victory were denied him because the findings were insufficient to support the judgment. Such judgment, however, would have had a basis in the evidence if the findings had been skillfully drawn. The same unfortunate situation arose in the case of conflicting findings, due to inadvertence or oversight, as in *Johnston* v. *Gloster,* 49 Cal. App. 750 [194 Pac. 504], where the appellate court found itself power-

less to do anything except reverse the case. To avoid such anomalous situations in the appellate courts the people of this state adopted section 4¾ of article VI of the Constitution, which authorized the legislature to grant to any court of appellate jurisdiction the power, in its discretion, to make findings of fact "contrary to, or in addition to, those of the trial court". Acting upon such constitutional authority the legislature adopted section 956a of the Code of Civil Procedure in 1927 (Stats. 1927, p. 583), which empowered appellate courts, in all cases where the facts were tried by the court, to "make findings of fact contrary to, or in addition to, those made by the trial court". "Contrary" means "opposite", and, in the phrase above quoted from, might easily be construed to mean that the appellate courts are no longer bound by the decisions of the trial court on conflicting evidence, but can weigh such conflicting evidence and make contrary findings if the weight thereof be determined to lie in that direction. Such was the contention of appellants in the case of *Tupman* v. *Haberkern*, 208 Cal. 256 [280 Pac. 970, 976], but the Supreme Court there held that it was not intended by the added section "to abrogate the general rule that findings of the trial court founded on substantial evidence are conclusive on appeal", but "that the primary and principal purpose of this exception is to enable the reviewing courts to make contrary or additional findings on the record presented or on new evidence taken, to the end that the judgment be affirmed or modified and affirmed and the litigation terminated". The Supreme Court has many times since reaffirmed the holding that where the evidence is conflicting it is bound by the decision of the trial court.

 In spite of the power thus given to the appellate courts, the trial courts remained powerless, on motions for a new trial, to add to their decisions, or to change them where they were conflicting in order to support the judgments rendered thereon, until 1929, when the legislature adopted section 662 of the Code of Civil Procedure. In our opinion it was not the purpose of such section to authorize a judge who did not hear the evidence to change the decision of one who did, by weighing conflicting evidence as to values and selecting the values which in his opinion are the

best, even assuming that such decision is not supported by the evidence.

■ The decision on a question of fact of one judge in a trial court composed of more than one is the decision of the court, and in our opinion to hold that the action of the legislature does what respondents claim for it would in effect be holding that the legislature has the power, without constitutional authority so to do, to vest a superior court judge with powers not contemplated by section 5, article VI, of the Constitution, and more akin to the jurisdiction of courts of appeal, though greater even, extending, as they would, not only to the reviewing of conflicting evidence but to the modifying of decisions reviewed in accordance with the judgment reached by the reviewing judge.

The strip sought to be condemned in the instant proceeding, which is one continuous right of way, is divided in the complaints into and described as thirteen separate parcels, in the Wright case, and three in the Hall case. Parcels 2, 4, 6, 7b, 8, 10 and 12 in the Wright case and parcel 2 in the Hall case are the portions of said strip included in the intersecting streets, which cross said strip and which the public now uses in crossing said right of way. The other parcels are the connecting strips of said right of way not in any way impressed with a public use. The award, as amended by Judge Collier, fixed the damage on each parcel. It fixed the damage at one dollar on each parcel embraced in an intersection and now impressed with a public use. Respondents urge that the failure of Judge Hazlett to apportion his award to each parcel required Judge Collier to make a change in the findings to correct such error. The values used by Judge Collier were based on the value of the fee as determined from the lots adjacent to American Avenue. The testimony of the appraisers shows that this value changed in each block, not alone in each parcel, and that it had no relation to the separate parcels as such. Assuming that the fee value was the proper measure of damages, the single allotment of Judge Hazlett could have been apportioned to the separate parcels, if such was necessary under the law, by a proportionate mathematical calculation, and such a change would have been justified under section 662 of the Code of Civil Procedure.

Over the objection of appellant the trial court permitted respondents to prove the value of the fee. Some eight experts testified for respondents as to such value. In computing the same they divided the right of way longitudinally into three strips, one being the center strip upon which the rails are laid and the other two the strips on each side, between said center strip and the street. The values given the land were based on the values fixed on lots facing American Avenue along such right of way. In computing the total value of the right of way in each parcel such appraisers put in the two outside strips at their full value and the center strip at fifty per cent of such values, because of the proposed joint use with the public. The appraisals of said eight experts in the aggregate ran from $974,645, the highest, to $957,763, the lowest. An appraiser for appellant placed the value at $613,012, without any such deduction for joint use, as the value of the fee for its highest and best use, not taking into consideration the continuance of the use by the railroad. Judge Collier, evidently by reason of the fact that the interlocutory decree reserved the right of the Pacific Electric Railway Company to use the full width of the strip, took fifty per cent of the value of the two side strips in fixing the award made by him, instead of the full value fixed by the appraisers. He adopted the appraisement of one expert as the basis for his computation, saying that his "work as an appraiser I have watched a number of times and in whose ability and integrity I have the utmost confidence". Such statement would seem to demonstrate the real predicament a judge finds himself in when he is compelled to draw a conclusion from the testimony of witnesses he did not observe during the trial, and the possible injustice to litigants that might arise in such cases. Another judge might have had confidence in the appraiser who fixed the total value at some $5,000 more, or in the rebuttal expert produced by appellant, which would have given respondents some $361,691 less than Judge Collier awarded. The judge who observed the experts testify might not have felt the necessity for relying entirely on a witness whose reputation and ability were known to him.

It was stipulated by the parties that on the fourth day of December, 1901, and for many years before, all of the land

embraced in said right of way was part of a regularly dedicated public street or highway known as American Avenue; that the owners of all of the real property on both sides of American Avenue adjacent to said right of way executed an agreement to execute and deliver a deed to said Pacific Electric Railway Company of all their right, title and interest in and to said right of way, upon the completion of the roadway, such deed, however, to contain a clause to the effect that such conveyance was made to said company "for the purpose of the construction and operation of a railroad thereon", and upon the condition that if said company "shall permanently cease to use said strip of land for railroad purposes, then and thereupon the title hereby granted shall become forfeited" to the grantors. Certain of said parties executed deeds in conformity with said agreement, but to the greater portion of said property no deeds were given. However, all of said right of way, except the crossings used by the public, has been exclusively used and maintained as a right of way by said Pacific Electric Railway Company since on or about July 4, 1902, and said company has paid all taxes assessed against such property. On February 12, 1902, the board of supervisors of Los Angeles County vacated and abandoned the land embraced in said right of way and ordered the same returned to acreage. Such strip at the time was not embraced within the limits of any body politic other than Los Angeles County. The interlocutory judgment provides that the easement obtained by condemnation is subject to the right of said railway company to maintain, repair, reconstruct and operate a double-track railway, together with its adjuncts and appurtenances as then operated, as well as to the right of such company at any time to lay, maintain, operate, repair and reconstruct one or two additional tracks or additional switch tracks and appurtenances. The findings and interlocutory judgment also allow as severance damages an additional sum of $146,811.

 (2) It would appear from the foregoing that as to a portion of said land the respondent railway company holds the fee subject to forfeiture if it is not used for railway purposes. As to the balance, entering as it did with the permission of the owners under agreements to give

similar deeds, not fulfilled, it is difficult to see how anything more than an easement for railway purposes could possibly have been acquired by prescription, as that is the only right that would seem to have been urged by the company through the prescriptive period. ■ It would seem that for all practical purposes the use of the right of way for railway purposes is the extent of the company's right thereto; and in view of the fact that its right to such use of the land is not taken, but will still continue after the public use is imposed thereon, we fail to see how the value of the fee can be used as the basis of measuring the damage to the company's use of such right of way.

■ In the case of *City of Los Angeles* v. *Allen,* 32 Cal. App. 553 [163 Pac. 697, 700], part of the land sought to be condemned was a parcel belonging *in fee* to the Pacific Electric Railway Company. There, as here, the plaintiff did not seek to interrupt the maintenance and operation of the electric railway over such right of way, but only to impress it with the public use as a street. Nominal damages alone were awarded. The court held that the results of the condemnation sought "are concrete, its interferences are to be actual, and the compensation therefor should be real. In ordinary cases where the condemnation is for a right of way for a use which constitutes a perpetual easement, and which will require practically the exclusive use of the surface, evidence is permitted to show, and the condemning party must pay, the value of the fee as the measure of damages sustained. Under such circumstances there can be no difference in value between the easement taken and the fee. 'When, however, such a difference does exist, the rule is different, and the value of the easement taken as distinguished from the value of the fee is alone to be ascertained by the jury and the owner compensated therefor.' (*Southern Pac. R. R. Co.* v. *San Francisco Sav. Union,* 146 Cal. 290 [79 Pac. 961, 106 Am. St. Rep. 36, 2 Ann. Cas. 962, 70 L. R. A. 221].)" Evidently the court in that case was of the opinion that even though the railway company owned the fee, where the only use made of it was a right of way over which to lay its rails and operate its cars, there was a very real difference between the value of the fee and the interference with its use of the fee by the joint use thereof with the public, and it laid down the rule that the measure

of damage in such a case is the "diminution in value of the railroad company's reserved rights of use in the property, to the extent that such diminution in value can be shown to be actually involved as a consequence resulting from the process of subjecting the land to street uses". That would seem to be the only damage that could possibly result from the taking of such an easement by the public. This was recognized by the court in such case in the use of very apt language, as follows: "The corporation having the original right is not, when the land is occupied concurrently by another corporation, entitled to recover the value of the land as measured by the most advantageous use to which it could be put. The true measure of damage in such case is the decrease in the value of the use of the land for the first purpose by reason of its being concurrently used for the second purpose."

■ The Supreme Court, in the case of *City of Oakland* v. *Schenck*, 197 Cal. 456, 462 [241 Pac. 545], says: "As the right to open a street across the railroad tracks was all that the city sought to obtain by the proceedings in condemnation, it was not bound to acquire and pay for the fee in land over which the street is opened. *The extent to which the value of the companies' right to use the land for railroad tracks was unduly diminished by opening the public street across it* was the only question to be determined by the jury. (*Chicago, B. & Q. R. R. Co.* v. *Chicago,* 166 U. S. 226, 251 [17 Sup. Ct. 581, 41 L. Ed. 979]; see, also, Rose's U. S. Notes.)" (Italics ours.) Certainly such *diminution in value* is not supported by evidence of the value of the fee, or by any arbitrary mathematical division of such value. Nor, in our opinion, does it necessarily follow that the value of defendant railway company's easement is the difference between the full value of the fee and a nominal value fixed on the fee by reason of its being subjected to the railroad use. But even assuming that it was, the question to be determined, in view of the fact that the railway company has all the rights it ever had, is: what is the damage to those rights by reason of the proposed concurrent use of the right of way by the public? The answer to that question cannot be found by determining the value of either the fee or the company's easement. In our opinion, and with all due respect to authoritative language that on its face would

seem to differ therewith, but which in principle we think does not, the question is one that cannot be settled by experts familiar only with given real estate values, or values of easements over given real property. The question to be solved involves the maintenance of tracks and the operation of trains, not the ownership of a right of way. The right of respondent railway company to operate its trains over which the public seeks a concurrent use will still exist. The maintenance of tracks and the operation of those trains may be somewhat interfered with by such public use, but the extent of that interference is certainly not within the scope of the experience of experts in land values only, but experts whose experience has involved the operation of trains under conditions of traffic interference. This damage, when ascertained, may be reflected back as the extent to which the exclusive right to operate trains over the right of way has been diminished; but it would seem that any other method of *ascertaining such diminution* is only a haphazard guess by one who has had no experience with the problem to be solved.

The case of *City of Los Angeles* v. *Allen, supra,* points out that an important difference exists between the extension of a street crossing over a railroad track and a taking for the purpose of constructing a street longitudinally covering the same, the opinion quoting the much quoted language found in Elliott on Railroads, section 1098, second edition, section 1566, third edition, viz.: ''The right to take longitudinally is very different from the mere right to cross, for in the one case the rights of the railway company are materially impaired, while in the other the taking is such that both uses can stand together.'' A reading of the entire section shows that the learned author was not writing about the measure of damages, but concerning *the authority of a municipality to exercise the right of eminent domain.* He shows such important difference to be this, viz.: that under the general power conferred upon a municipality to lay out and open streets and highways or to construct a highway from one point to another, the power is implied to cross the tracks and rights of way of railroad companies, but that under such implied general power to cross, no part of the railway can be taken for the purpose of constructing a parallel or longitudinal street covering such rights of way.

And the cases cited support the text to that extent. We must admit it is a very important difference, but it has nothing to do with damages. Just where the learned author finds any justification, after saying "for in the one case the rights of the railway company are materially impaired", to add, "while in the other the taking is such that both can stand together", we fail to see. The language last quoted seems to imply that the right of way is useless to the railroad after a longitudinal taking for a public street. Such joint use in every city and town in the land having street railroads within its borders is a complete refutation of such statement, if refutation is needed. No question exists in California as to the right of a municipality to so take, if the public necessity exists and compensation is paid.

In the Hall case, now before us, there are three 60-foot streets entering American Avenue on opposite sides which do not cross the right of way. Under the crossing rule the railway company would get one dollar for each crossing; yet under the measure of damages upon which the award herein was made a very substantial amount was awarded therefor.

That the additional use proposed by the City of Long Beach will to some extent slow up the running time of respondent railway company's cars—already slowed up to some degree, no doubt, by the existing crossings—must be conceded. That such slowing of time, together with the stopping and starting involved, would cause a loss of electric energy and an increase in cost of operation was testified to by witnesses for the company; but a witness for appellant testified that while there would be only a slight loss in running time for the length of the strip, there would be an actual saving in electricity. The loss was fixed by one witness for defendants at approximately $6,000 per year for the entire strip. At six per cent interest the amount awarded by Judge Hazlett would produce such an amount.

Respondents also introduced some evidence, which was purely speculative, as to loss of earnings that would be caused by the slowing up of the running time of the railway company's trains. In our opinion such evidence was immaterial. An award of damages to business is not authorized. (*Oakland* v. *Pacific Coast Lumber etc Co.*, 171 Cal. 392 [153 Pac. 705].)

██ Inasmuch as in our opinion the damage to be awarded must be based on the loss caused by the public interference with defendant railway company's use of the right of way in question, there would seem to be but one parcel to be considered in each case, so far as respondents are concerned. The damage relates to the strip as a whole, and not to the respective parcels. This, of course, is not true as to the defendants who were awarded one dollar each. In view of that fact we conclude that the award of Judge Hazlett was properly made on the entire strip covered by each complaint, and it would seem to be a useless and unnecessary requirement to divide the single loss proportionately between the several parcels named in each complaint as such—possibly for the purpose of more convenient description.

There being evidence to support the original award made for the rights that will actually be taken, and no complaint concerning the same by appellant, it would seem that such award should stand; and there being no appeal from the other provisions and awards in the original interlocutory decrees, and no objection thereto by appellant, those also should stand.

The interlocutory decrees as amended in each case are reversed, and we hereby adopt as findings of fact and conclusions of law in each case the findings of fact and conclusions of law originally filed therein. The lower court is directed to enter judgment in each case in accordance with such findings of fact and conclusions of law.

Works, P. J., and Stephens, J., concurred.

A petition by respondents to have the cause heard in the Supreme Court, after judgment in the District Court of Appeal, was denied by the Supreme Court on November 27, 1933.

Thompson, J., dissented.