WEST VIRGINIA BOARD OF REGENTS,

*a corporation*

*v.*

FAIRMONT MORGANTOWN PITTSBURGH RAILROAD COMPANY,

*a corporation*

*and*

THE BALTIMORE AND OHIO RAILROAD COMPANY,

*a corporation*

(No. 13784)

Decided December 19, 1978.

*Rose, Southern & Padden, Herschel Rose and Duane Southern, Thomas L. Samuel,* Baltimore, for plaintiffs in error.

*Mike Magro,* Special Assistant Attorney General, for defendant in error.

NEELY, JUSTICE:

This appeal arises from an eminent domain proceeding instituted by the West Virginia Board of Regents to condemn an aerial easement and certain surface rights-of-way owned by appellant railroads for construction of a personal rapid transit system to serve West Virginia University. At trial, the court instructed the jury to return a verdict for the railroads of one dollar and judgment was entered for that nominal award. The railroads appeal on the grounds that the lower court failed to determine appellee's power to condemn railroad property for construction and operation of the transit system; the lower court erred by refusing to admit the railroad's proffered evidence relating to loss resulting from the condemnation; and, the lower court erred by directing a one dollar verdict. We reverse and remand.

The personal rapid transit system, known popularly as the PRT, is a system of electric powered, rubber tired, computer controlled cars operating on elevated guideways. The Regents condemned an aerial easement roughly parallel to the railroads' tracks for a linear distance of four-fifths of a mile, and in order to construct the aerial guideways, it was necessary to condemn parts of the railroads' surface right-of-way for construction of pillars. The railroads initially challenged the Regents' petition to condemn, and when the lower court granted appellee's motion for immediate entry the railroads appealed unsuccessfully. *West Virginia Board of Regents v. Fairmont, M. and P.R. Co.,* 155 W. Va. 863, 189 S.E.2d 40

(1972). Commissioners appointed by the lower court pursuant to *W.Va. Code,* 54-2-5 [1963] assessed the railroads' damages at $65,000; the railroads then demanded a jury trial pursuant to *W.Va. Code,* 54-2-10 [1967], much to their ultimate sorrow.

At trial, the Regents presented evidence relating solely to the area and extent of the easements and rights-of-way taken. The railroads, however, proffered substantial evidence of the fair market value of the property and the damages to the residue of their right-of-way.[1] Testi-

---

[1] The railroads offered the following evidence, all of which was ruled inadmissible: Testimony of Hugh Runner, a qualified real estate appraiser in the Morgantown area, that the fair market value of the surface and aerial easements taken by appellee was $55,800; testimony of Vernon L. Grose, a qualified engineer trained in systems management and risk management safety, that the close proximity of the PRT to the railroad posed serious hazards of derailment which would require special operational procedures and procurement of liability and casualty insurance; testimony of Robert Kendall, Senior Design Engineer, Bridge Division, Chessie System, that a train derailment resulting in impact with the PRT supports would result in destruction of the supporting pillars; testimony of H. Robert Hogan, the B&O trainmaster for the Morgantown area, that there are three grade crossings along the track affected by the PRT which currently are not equipped with any warning devices other than a crossing sign and the engine's whistle, and that the PRT supporting pillars on either side of the crossings prevent an engineer from having his previously unobstructed view which provided sufficient opportunity to stop the train at eighteen miles an hour; the further testimony of Mr. Hogan that many derailments are caused by crossing collisions, vandalism, latent defects, and other causes not the fault of the railroads; the testimony of William J. Hendley, a qualified engineer and railroad administrator, that the best protection for the railroads would be installation of warning flashers and other safety equipment at two of the three crossings; the further testimony of Mr. Hendley that the possibility of derailment due to other causes could be minimized by installation of hot box detectors, dragging equipment detectors and loose wheel detectors in the PRT-railroad interface area; the testimony of William E. Bremer, a signal communications designer, that it would cost $36,137 to install the necessary warning flasher systems with an annual maintenance cost of $1,100 and that it would cost $277,930 to install the hot box detector, dragging equipment and loose wheel detectors with an annual maintenance cost of $2,400; the testimony of Clarence Daw-

mony was also offered tending to show that negotiations between the railroads and Regents had not resolved the safety problems.

## I

This case is obviously one of first impression in West Virginia as we do not routinely construct systems of electric powered, rubber tired, computer controlled cars operating on elevated guideways. We are urged by the Regents, however, that this case comes within the purview of *City of Welch v. Norfolk & Western Ry.*, 104 W. Va. 660, 140 S.E. 839 (1927) which contained interesting rulings on the appropriate measure of damages when a municipality constructs a new grade crossing over a railroad right-of-way. We held in that case that increased operating expenses occasioned by a new crossing, including for example the need to cut trains so that they will not block the crossing for a longer period than that permitted by statute, the need to slow the operation of the trains, and the need to install signaling devices, are not compensable elements of damage. We said in that case:

> It is not questioned by the city that some damages are recoverable by the railroad; and such is the law. But damages are not assessable for the interruption and inconvenience occasioned to the business of the railroad by the opening of the new highway, nor for increased expenses or increased risks in running their trains occasioned thereby. According to proffered testimony of the utility, this damage was estimated to amount to hundreds of thousands of dollars. The very amount insisted upon proves the fallacy of the

---

son, a retired insurance officer of the B&O Railroad, that the PRT-railroad interface requires procurement of additional liability and casualty insurance by the railroads, the annual premiums of which would be approximately $40,000 if a policy with a sufficient ten million dollar limit is procured; and, the testimony of Dr. Richard Raymond, Professor of Economics at Kent State University, that the present value of the costs to be incurred by the railroads to minimize and protect against hazards created by the PRT's presence totals $1,424,908.

claim. These matters are clearly within the realm of police regulation, damages for which would be too vague and uncertain for calculation. (Citations omitted). 104 W. Va. at 671, 140 S.E. at 843.

The *Welch* case, *supra,* does allow the railroad certain direct and foreseeable expenses;

Accordingly, if a railroad company is obliged to remove or abandon the use of any structure or side track which come within the highway location, it is entitled to compensation for such loss, and, furthermore, it is entitled to compensation for the cost of making such structural changes in its roadbed and track as are necessary to preserve the track for its former use. (Citation omitted). 104 W. Va. at 668, 140 S.E. at 842.

The issue before us now, however, does not involve a simple grade crossing which our law apparently contemplates to be a largely uncompensable annoyance to a railroad in its operation. Rather, the case before us involves the taking of an easement by another public utility for the purpose of constructing a parallel facility. This very eventuality is covered by *W.Va. Code,* 54-1-9 [1971] which has been on the books in substantially the same form since 1849 and which provides in pertinent part;

If any such company, private corporation, public corporation, West Virginia department of highways or county court desire that the course of any other railroad, canal, sewer line, pipeline, state, or other public road, telephone or telegraph line, electric transmission line, or any stream which is not a public highway, be altered to avoid the necessity of any crossing, or of frequent crossings, or to facilitate the crossing thereof, or the construction of a parallel work, the alteration may be made in such manner as may be agreed between the said party desiring such alteration and the owner of such other facility or land to be affected thereby. In case the parties interested fail to agree upon such crossing or alteration as is desired, said party desiring

such crossing or alteration may bring a civil action, and in such action the court may, in a proper case, order that any proper crossing, or alteration, may be made upon payment of just compensation for the property or interest in property to be taken and upon payment of damages, if any, to the residue thereof beyond all benefits to be derived thereby.

This code section has been interpreted in one of its previous incarnations in *Railroad Co. v. Traction Co.*, 56 W. Va. 18, 48 S.E. 746 (1904) in which a steam railroad running substantially east/west sought to cross the line of an electric streetcar line running substantially north/south. In that case we held:

That a crossing of the right of way and track of one railroad company by the track of another amounts, at least, to the acquisition of an easement by the latter over property owned by the former, is so manifest as to render discussion or citation of authority to that effect useless. However, it has been, in effect, so decided in *Tuckahoe Canal Co. v. Tuckahoe & James River R.R. Co.*, 11 Leigh 42. In that case, Judge Tucker makes it clear that the property owned by an internal improvement company and used by it in the exercise of its franchise is not the franchise itself, but is, on the contrary, private property subject to the *jus publicum*. Whether, in obtaining such crossing, the ownership of the fee is affected or disturbed does not enter into this inquiry. The acquisition of a right of way only over the property of another is the taking from that other of a thing of value, a valuable right to the use of the land for certain purposes, and it can be done without the consent of the owner, only in the manner and upon the terms prescribed by law. 56 W. Va. at 22, 48 S.E. at 747.

Obviously the broad perimeters of the method which is provided by law may be found in *West Virginia Constitution*, Art. 3, § 9, which provides that:

Private property shall not be taken or damaged for public use, without just compensation;

nor shall the same be taken by any company, incorporated for the purpose of internal improvement, until just compensation shall have been paid, or secured to be paid, to the owner; and when private property shall be taken, or damaged, for public use, or for the use of such corporation, the compensation to the owner shall be ascertained in such manner, as may be prescribed by general law; provided, that when required by either of the parties, such compensation shall be ascertained by an impartial jury of twelve freeholders.

It should be evident from the brief citation of these authorities, including by the way even *Welch v. Norfolk & Western, supra*, relied upon by the Regents, that the railroad is entitled to more than nominal damages and that it has an absolute right to a determination of the amount of that entitlement by a properly instructed jury.

## II

It now devolves upon us to determine what the proper instructions in a case of this nature should be. From the facts before us it appears that there are three aspects to the railroads' damages: first, the value of the land taken for the use of the PRT; second, the value of the aerial easement over the railroads' right-of-way; and third, the damage to the residue of the railroads' right-of-way as used for railroad purposes.[2]

While the railroads are entitled to compensation for the taking of that portion of their location which falls within the limits of the PRT, it is generally held elsewhere that railroads are not limited to the fair market value of land along rights-of-way measured by the price

---

[2] The rules set forth in this case are limited to condemnations of railroad rights-of-way; these unique rules are not applicable to other property owned by a railroad which could be bought and sold in the market place such as abandoned stations or property adjacent to a yard. In cases involving property other than a right-of-way the measure of damages for a railroad is the same as for any other landowner.

per square foot of comparable property in the same neighborhood used for private purposes. *Chicago, Burlington and Quincy R. Co. v. Chicago*, 166 U.S. 226 (1897). *See also, Louisville & Nashville R.R. Co. v. City of Louisville*, 131 Ky. 108, 114 S.W. 743 (1908); *Sanitary Dist. v. Pittsburgh, Ft. W. & C. Ry. Co.*, 216 Ill. 575, 75 N.E. 248 (1905); *City of Grand Rapids v. Bennett*, 106 Mich. 528, 64 N.W. 585 (1895). The reasons assigned for the distinction between railroads and others are that: (a) a railroad location is devoted to a special and peculiar use from which it cannot be diverted without authority from the Legislature, and so, even if the railroad company owns the fee, the land has no market value for general purposes; and, (b) such property is not commonly bought and sold in the market and its market value is consequently incapable of estimation.[3] *See generally, Chicago, Burlington and Quincy R. Co. v. Chicago, supra; City of*

---

[3] According to the weight of authority, many of the special rules for railroads which do not apply to other property owners are grounded on sound public policy which frankly recognizes the favored position which railroads are accorded. For example, a railroad is permitted to construct its own right-of-way along property it condemns at its own expense instead of being required to use the publicly constructed highways or disorganized public airways; a railroad need not confine itself to the public waterways where it must constantly be impeded by the need to stop at federal locks; a railroad is permitted to construct its own terminal and switching facilities on its own land and is freed from the need to use federally controlled facilities such as interstate highway interchanges and airports; a railroad is permitted to pay both property and business and occupation tax, instead of being confined to business and occupation taxes alone; a railroad is permitted to carry on its business under government regulation regardless of whether it makes a profit, and in furtherance of this privilege is permitted to dedicate all of its accumulated capital to the public service without need to pay any stockholder dividends; and, finally a railroad is permitted to be informed by the expertise and judgment of the Interstate Commerce Commission before it may merge with other railroads or initiate any other major organizational changes rather than having to rely exclusively on its own independent business judgment. For a discussion of railroad regulation *see* F. N. Krutter *The Railroad Revitalization and Regulatory Reform Act of 1976: Improving the Railroad's Competitive Position,* 14 Harv. J. Legislation 575 (1977).

*Long Beach v. Wright*, 134 Cal. App. 366, 25 P.2d 541 (1933); *Postal Tel. Cable Co. v. Oregon Short Line R. Co.*, 114 F. 787 (Cir. D. Mont. 1902).

We find from the weight of general authority that the proper measure of damages for the land taken from the railroad for the construction of the PRT is the fair market value of the land *for railroad purposes*, and that is probably best expressed as what a reasonable railroad, willing to buy but under no compulsion to buy, owning a right-of-way which did not include the property condemned would be willing to pay to a willing seller desirous of selling but under no compulsion to sell, for the purpose of *acquiring* all of the land which the comdemning authority intends to take. Stated more simply, this almost amounts to what the railroad would be willing to pay to reacquire the land, but obviously that must be proven by objective evidence rather than subjective statements of railroad officers. This measure of damages recognizes the special use to which the railroad has dedicated its right-of-way and it is a two-edged sword. While, indeed, in a congested metropolitan area it may yield to the railroad a lower compensation than the square foot real estate value of comparable property, the railroad in other situations is nevertheless permitted to demonstrate that it has a very valuable use for a particular piece of property, and is entitled to compensation based on that special use regardless of the value of surrounding land.[4]

------

[4] The special use evaluation of land applicable to railroad rights-of-way for determination of just compensation in an eminent domain proceeding against the railroad is unique in that the usual determinant of just compensation for land taken is fair market value of the land or what a willing buyer desirous of buying but under no compulsion to buy would be willing to pay to a willing seller desirous of selling but under no compulsion to sell. *Wheeling Elec. Co. v. Gist*, 154 W. Va. 69, 173 S.E.2d 336 (1970). *See also, State Road Com'n. v. Board of Parks Com'rs.*, 154 W. Va. 159, 173 S.E.2d 919 (1970). The value of the land to the party taking it is not considered nor is the value to the landowner *personally* considered as long as the owner of the property is put in as good a position *pecuniarily* as if his property had not been taken. *State Road Com'n. v. Board of Parks Com'rs., supra.* The emphasis of the word

Evidence of the need to install new signaling devices, of the inability to proceed safely at greater than a particular speed because of obstructed view, or other operating problems are all evidence bearing upon what a reasonable railroad would be willing to pay for the purpose of acquiring such land as is being condemned for its own use for railroad purposes. We are quite concerned by the speculative nature of many of the railroads' alleged damages, but we feel that by requiring the jury to put themselves substantially in the place of a reasonable railroad to determine what that hypothetical railroad would actually pay in out-of-pocket cash, we have struck a fair balance which will justly compensate the railroads without providing an unconscionable windfall.

## III

Perhaps the least complex problem in this case involves the value of the aerial easement over the railroads' right-of-way. The measure of damages for that easement is exactly the same as for the land taken for the construction of the cement columns and other necessary structures, namely the value of the aerial easement to a reasonably prudent railroad for railroad purposes. Somehow as we reflected upon this case it occurred to the Court that the use of air space for railroad purposes probably is limited by the height of the railroads' lowest, regularly used tunnel on the particular section of road in question. Nonetheless, if the railroad can demon-

---

"pecuniarily" is important because sentimental value and peculiar uses are not to be considered, although the owner does have the right to consideration of any use to which the land could reasonably be put, regardless of its present use. *Railway Co. v. Davis*, 58 W. Va. 620, 52 S.E. 724 (1906). While *Davis* speaks in terms of allowing consideration of peculiar uses to the *landowner*, the elements of value are still limited to those which hypothetical market purchasers would consider in arriving at a just price. *Davis, supra; Richmond & M. Ry. Co. v. Humphreys*, 90 Va. 425, 18 S.E. 901 (1894). *See also, State Highway Comm'r. v. Reynolds*, 206 Va. 785, 146 S.E.2d 261 (1966). While a railroad whose right-of-way is being taken cannot avail itself of the general fair market value formula neither is it limited by that formula when its application would be unfavorable.

strate that it reasonably intends to employ new technology which will, in the foreseeable future, cause its air space to be of greater than nominal value to it, it may introduce such evidence and the measure of damages for the taking of the aerial easement would be what a reasonably prudent willing but uncompelled railroad would be willing to pay to the traditional willing but uncompelled seller to acquire the air rights.

## IV

The most complex issue in this case involves the measure of damages to the residue of the railroad right-of-way caused by parallel construction of a dangerous, high-energy, passenger service which is likely to subject the railroad to increased liability. We can envisage that in this area the railroads' gallery of horribles will be almost limitless; therefore, it appears appropriate to set forth those measures of damage which are *prima facie* not speculative and will support a sound award. First, the railroads are entitled to operate a reasonably safe right-of-way; they are not, however, entitled to operate the safest right-of-way since time out of mind, *i.e.*, they are not entitled to construct a champagne railroad at the expense of the taxpayers' beer budget. Accordingly they may introduce into evidence any expenses which they expect reasonably to incur for the construction of safety devices which are required by any federal or state statute or by any rule or regulation of any federal or state regulatory commission or other agency which has general supervisory authority over railroads in West Virginia. Furthermore, if the railroads can prove that a particular safety procedure is *actually* employed by a majority of reasonable railroads throughout the United States, notwithstanding the fact that a particular safety practice is not mandated by statute or regulation, the railroads may introduce such evidence for jury consideration if they first lay a proper foundation concerning its actual and consistent use by a majority of railroads in similar circumstances.

We agree with the railroads' counsel that there is a high potential for liability generated by the proximity of two high-energy sources, one of which, the PRT, routinely carries ten to thirty passengers along an aerial structure which is susceptible to being demolished at any moment by a railroad derailment. Furthermore, as the railroads attempted to prove in their proffered testimony, there may be a greater risk to the railroads' trains as the result of vandalism, collision, or other circumstances. Consequently, as one element of the railroads' damages to the residue, the railroads may introduce into evidence the actual cost of their increased insurance premiums attributable to the risk along this four-fifths mile of track. However, they must demonstrate that the limits of coverage are those which a reasonably prudent railroad would secure, as opposed to the most desirable possible limits of coverage, and that the premiums for such coverage are what would be charged routinely in the market place by insurance carriers regularly engaged in the business of insuring railroad operations, to a railroad of the size of the appellant railroads, *as an additional or marginal* premium in excess of the premiums which are already being paid for the overall insurance of the railroads' operations. If the railroads are self-insurers, then the measure would be the difference between what the most economical, reliable insurer would charge to insure the railroads' operation as currently constituted plus the increased liability for the section of track under the PRT, less the amount that they would charge for the railroads' operations as currently constituted.

To reiterate the point in a different way, railroads already insuring a major operation against innumerable hazards may not increase their *total* risk to a statistically significant extent by virtue of the PRT operation in proximity to their tracks for four-fifths of a mile. Certainly they will pay less than someone who seeks to insure that four-fifths mile of track alone, and so it becomes only the marginal premium to the railroads

which is relevant evidence for the purpose of assessing damages.

Accordingly for the reasons set forth above the judgment of the Circuit Court of Monongalia County is reversed and the case is remanded for a new trial consistent with the guidelines set forth in this opinion.

*Reversed and remanded.*